UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
UNITED STATES OF AMERICA,

       -against-
ORDER
                                                    06-CR-0550 (JS)

SANDRA HATFIELD, DAVID H. BROOKS,
PATRICIA LENNEX,

               Defendants.
------------------------------------X

APPEARANCES:

For Government:       Richard Thomas Lunger, Jr., Esq.
                        Christopher Allen Ott, Esq.
                        James Halleron Knapp, Esq.
                        James M. Miskiewicz, Esq.
                        United States Attorneys Office
                        610 Federal Plaza
                        Central Islip, NY 11722-4454

For Defendants:

Sandra Hatfield      Roland G. Riopelle, Esq.
                        Maurice H. Sercarz, Esq.
                        Sercarz & Riopelle, LLP
                        152 West 57th Street, 24th Floor
                        New York, NY 10019

David Brooks         John C. Meringolo, Esq.
                        Meringolo and Associates, P.C.
                        1790 Broadway, Suite 1501
                        New York, NY 10019

                        Zaki I. Tamir, Esq.
                        Gofer Tamir and Assoc.
                        55 Broad Street
                        New York, NY 10004

                        James M. LaRossa, Esq.
                        240 West End Avenue
                        New York, NY 10023

                        Kenneth Ravenell, Esq.
                        William H. Murphy, Jr., Esq.
                        The Murphy Firm
                        1 South Street, 23rd Floor
                        Baltimore, MD 21202

                        Richard Ware Levitt, Esq.
                        Yvonne Shivers, Esq.

```
                    Law Offices of Richard W. Levitt
                    148 E. 78th Street
                    New York, NY 10021

Patricia Lennex:   Michael F. Bachner, Esq.
                    Bachner & Herskovits, P.C.
                    26 Broadway, Suite 2310
                    New York, NY 10004
```

SEYBERT, District Judge:

Pending before the Court is Defendant David Brooks' motion to dismiss the Indictment, or, in the alternative, suppress certain evidence, based on alleged violations of the attorney-client privilege and attorney work-product doctrine. On February 23-26, 2009, the Court held an evidentiary hearing on this matter. On July 9, 2009, Defendant Sandra Hatfield joined Mr. Brooks motion. Based on the evidentiary hearing, and the parties submissions, the Court has reached the following preliminary findings.[1]

## BACKGROUND

On October 25, 2007, Mr. Brooks was charged with 18 counts of alleged criminal activity stemming from his tenure as D.H.B. Industries Inc.'s ("DHB" or "the Company") Chief Executive Officer and as a member of the Company's Board of Directors. The Superseding Indictment charges that Mr. Brooks devised and carried

---

[1] Given the limited evidentiary record to date, and the extremely sensitive issues associated with a criminal indictment, the Court will not apply the "law of the case" doctrine to the factual findings it makes in this opinion. Instead, the Court remains open to the parties introducing more evidence in support of their dueling positions.

out fraudulent schemes to defraud DHB and its shareholders of money, property, and his honest services. Among other things, the Superseding Indictment charges that Mr. Brooks participated in schemes to inflate DHB's gross profit margins, convert DBH's resources into unauthorized and undisclosed compensation, and conceal related party transactions.

Following the Indictment, the Government produced voluminous discovery material to Mr. Brooks which the Government had originally obtained from DHB and other third-parties. Combing through this material, Mr. Brooks and/or his counsel have discovered several documents that Mr. Brooks contends DHB and the other third-parties should not have produced to the Government, because they are allegedly protected by the attorney-client and joint defense (or common interest) privileges and the attorney work-product doctrine.[2]

Mr. Brooks argues that the Government invaded applicable privileges and protections by keeping and reviewing this material, instead of returning it to its source or alerting him of potential privilege issues with respect to it. As a remedy, Mr. Brooks seeks the dismissal of the Indictment against him or, in the alternative,

---

[2] The Court is aware that the attorney work-product doctrine is not technically a privilege, but rather a qualified protection from disclosure. However, for the sake of brevity, the Court uses the word "privilege" throughout this opinion to include both any applicable privilege belonging to Mr. Brooks, and whatever protection Mr. Brooks might enjoy under the work-product doctrine.

the suppression of all material protected by a privilege belonging to Mr. Brooks.

In connection with his motion, Mr. Brooks submitted a detailed log of privileged documents that the Government supposedly impermissibly obtained. Generally speaking, these documents fall into the following categories: (1) documents created by Huron Consulting Group ("Huron"); (2) documents created by Mr. Brooks' attorneys, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C. ("Mintz Levin"), but later disclosed to Huron; (3) documents created by Mintz Levin but produced to the Government by DHB; (4) documents created by another law firm retained by Mr. Brooks, Schlam, Stone & Dolan LLP ("Schlam Stone") or by the forensic accounting firm, Stroz Freidberg LLC ("Stroz Friedberg"), that Schlam Stone retained; (5) documents created by yet another one of Mr. Brooks' law firms, Milbank, Tweed, Hadley & McCloy, LLP; (6) alleged joint defense communications between Mr. Brooks and/or his attorneys and other persons or entities; and (7) communications monitored by Vance International, Inc. ("Vance") pursuant to Mr. Brooks' bail arrangement. Following a discussion of the applicable law and burdens, the Court will discuss each of these categories, in turn.

<u>DISCUSSION</u>

I.   <u>The Law of Privilege</u>

The attorney-client privilege protects: (1) a

communication between client and counsel; that (2) was intended to be and was in fact kept confidential; and (3) was made for the purpose of obtaining or providing legal advice. See In re County of Erie, 473 F.3d 413, 419 (2d Cir. 2007).

The attorney work-product doctrine "provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial." In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002, 318 F.3d 379, 383 (2d Cir. 2003). There are two types of work product, "fact" and "opinion." In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d 180, 183 (2d Cir. 2007). Fact work product encompasses "factual material, including the result of a factual investigation." Id. In contrast, "opinion work product reveals the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative, and is entitled to greater protection than fact work product." Id. (internal citations and quotations omitted). To be entitled to protection for opinion work product, the party must show "a real, rather than speculative, concern that the work product will reveal counsel's thought processes in relation to pending or anticipated litigation." Id. at 183-184. However, the work product doctrine is "stricter" in "the context of a pending criminal prosecution," where it "preclud[es] discovery of documents made by a defendant's attorney or the attorney's agents except with respect to 'scientific or medical reports.'" In re Grand Jury

<u>Subpoenas Dated March 19, 2002 and August 2, 2002</u>, 318 F.3d at 383 (citing Fed. R. Crim. P. 16(b)(2)).

In considering privilege questions that arise in a federal criminal prosecution case, the Court applies "principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed. R. Evid. 501. Thus, the Court turns first to the decisions of the United States Supreme Court, the Second Circuit, and the Second Circuit's district courts in settling questions concerning the attorney-client privilege and the work product doctrine (<u>i.e.</u>, "courts of the United States"). However, because the Court must apply privilege law "in the light of reason and experience," it is "entirely appropriate for federal courts to evaluate state precedent for whatever light it might shed on" questions unsettled under federal law. 2 FED. EVID. § 5:4 (3d ed.). Thus, if not bound by Supreme Court or Second Circuit precedent, the Court may "properly consider both state judicial opinions and state statutes," along with its own reasoned understanding, in resolving federal common law privilege questions. <u>Id.</u>

Here, the principle privilege questions at issue concern: (1) whose burden it is to establish privilege; (2) whose burden it is to show that an applicable privilege was waived; and (3) what circumstances constitute waiver. With respect to (1), the Second Circuit has definitively held that the party asserting privilege

6

"bears the heavy burden of establishing its applicability." <u>In re</u> <u>Grand Jury Subpoena Dated July 6, 2005</u>, 510 F.3d at 183.  In the privilege context, this means that the party asserting it must show that "the information was a communication between client and counsel, that it was intended to be and was kept confidential, and [that] it was made in order to assist in obtaining or providing legal advice or services to the client." <u>HSH Nordbank AG New York</u> <u>Branch v. Swerdlow</u>, __ F.R.D. __, 2009 WL 2223476, *3 (S.D.N.Y. July 24, 2009) (collecting cases); <u>United States v. Int'l Bhd. of</u> <u>Teamsters</u>, 119 F.3d 210, 214 (2d Cir. 1997) ("[t]he burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it").

The law is a little less clear with respect to who has the burden of establishing waiver.  Within the Second Circuit, the majority view appears to be that the person asserting privilege has the burden of showing that he has not waived it, on the grounds that maintaining confidentiality is an element of the privilege itself.  <u>See</u>, <u>e.g.</u>, <u>Costabile v. Westchester, New York</u>, 254 F.R.D. 160, 163 (S.D.N.Y. 2008); <u>Scanlon v. Bricklayers and Allied</u> <u>Craftworkers, Local No. 3</u>, 242 F.R.D. 238, 246-247 (W.D.N.Y. 2007); <u>In re Asia Global Crossing, Ltd.</u>, 322 B.R. 247, 255 (S.D.N.Y. Bnkr. 2005).  This view is also found in New York State law, and applied when federal courts sitting in diversity apply New York law.  <u>See</u>, <u>e.g.</u>, <u>HSH Nordbank AG New York Branch v. Swerdlow</u>, __ F.R.D. __

(S.D.N.Y. 2009) (citing <u>John Blair Comm'ns, Inc. v. Reliance Capital Group, L.P.</u>, 182 A.D.2d 578, 579, 582 N.Y.S.2d 720 (1st Dep't 1992)); FED. R. EVID. 501.

There is, however, a minority view that the party claiming waiver has the burden to establish it. <u>See</u>, <u>e.g.</u>, <u>JA Apparel Corp. v. Abboud</u>, 07-CV-7787, 2008 WL 111006, *2 n.1 (S.D.N.Y. 2008); <u>Gramm v. Horsehead Industries, Inc.</u>, 87-CV-5122, 1990 WL 142404, *2 (S.D.N.Y. 1990) ("If such a privilege is established, it then becomes the burden of plaintiffs to demonstrate the facts establishing a waiver."). This reasoning appears to be based on viewing waiver as an exception to the privilege. <u>See JA Apparel Corp.</u>, 2008 WL 111006 at *2 (citing 24 FED. PRAC. & PROC. 5507).

Finally, there appears to be an intermediate view. Under this approach, the party asserting waiver "has the burden of proving that waiver occurred," unless the purportedly privileged documents have already been disclosed to third parties. 2 FED. EVID. § 5:33. But once a third party possesses the purportedly privileged material, "the court may require the holder to show that he did not waive the privilege." <u>Id.</u>; <u>see also</u> <u>Business Integration Services, Inc. v. AT&T Corp.</u>, 251 F.R.D. 121, 124 (S.D.N.Y. 2008) (once disclosure occurs, the party claiming privilege has the "burden to show that its privilege was not waived through disclosure") (citations and quotations omitted); <u>Denney v. Jenkens</u>

& Gilchrist 362 F. Supp. 2d 407, 412 (S.D.N.Y. 2004) ("It is therefore [the party asserting privilege's] burden to show that its privilege was not waived through disclosure to Jenkens.").[3]

As there is no definitive Second Circuit precedent on point, the Court has decided – in the exercise of its own "reason and experience" – to apply its own burden-shifting framework, which most closely resembles the intermediate view described above. See Fed. R. Evid. 501. Consistent with Second Circuit precedent, the Court assigns Mr. Brooks the initial burden of showing that he communicated with his attorneys in confidence, and intended to keep those communications confidential. See In re County of Erie, 473 F.3d at 419. If Mr. Brooks can meet that initial burden, he does not need to go through the burdensome (and borderline impossible) task of showing that he did not waive privilege with respect to each and every document in question. Instead, the burden shifts to the Government to show that Mr. Brooks waived privilege, such as by disclosing the documents in question, or by disclosing documents that concern the same subject matter. See In re Grand Jury Proceedings, 219 F.3d 175, 183 n.4 (2d Cir. 2000) (the disclosure of some privileged communications operates as "a waiver as to all

---

[3] The Government initially asked the Court to adopt the majority view. Its July 17, 2009 letter, however, appeared to suggest that the intermediate view was also an appropriate standard – noting that "[w]here, as here, the putative privilege holder has lost control of a document, the burden rests on Brooks and Hatfield."

other communications to the attorney on the same matter")
(citations and quotations omitted). Among the ways that the
Government can meet this burden is by showing that a third party
gained possession of either the documents in question, or documents
similar enough to cause subject matter waiver. Should the
Government meet this burden, the burden then shifts back to Mr.
Brooks to explain, with evidence, why privilege was maintained
despite a third party possessing the documents (e.g., disclosure
was inadvertent or unauthorized, third party was a member of a
joint defense agreement, etc.). The Government can then respond
with its own evidence to undercut Mr. Brooks' explanations, and/or
to show that waiver nevertheless occurred. At each stage of this
burden shifting framework, the Court will adopt a preponderance of
the evidence standard. See Shumaker, Loop & Kendrick, LLP v.
Zaremba, 403 B.R. 480, 484 (N.D.Ohio 2009).

II.  Mr. Brooks' Privilege Claims

    A.  Huron Documents

        A.  Were the Huron Documents Privileged?

The first category of documents that Mr. Brooks asserts
privilege over concerns documents generated by Huron. Mr. Brooks
contends that Huron created these documents pursuant to an
engagement with his attorneys, Mintz Levin. The Government
contends that Huron produced this material while working on DHB's
behalf. Thus, the Government argues that Mr. Brooks can claim no

privilege with respect to them.

The evidence submitted thus far establishes that Mintz Levin originally retained Huron to work on Mr. Brooks' behalf, signing a formal engagement letter on March 13, 2006. (HU0001-0002). There is conflicting evidence regarding how long this arrangement lasted. In his deposition, Huron's Richard Pimentel suggested that it lasted only a week. (Mo. Ex. 3). E-mail correspondence between Huron and Mintz Levin indicates that Huron's work on Brooks' behalf lasted until April 10, 2009, when Huron and Mintz Levin agreed that Huron work directly for DHB, rather than on Mr. Brooks' personal behalf. (HU0011). Under this arrangement, Mintz Levin agreed that, because Huron would work for DHB directly rather than any law firm, Huron would "no longer have attorney client and work product privileges" except with respect to "some of our prior communications." (Id.). Despite this apparent change of clients, Huron appeared to sometimes refer to its work as the "David Brooks" or "David H. Brooks" matter, although it also used the phrase "DHB Matter." (HU0047-155). Following April 10, 2006, Huron generally directed its bills at David Brooks in his DHB capacity, although it sometimes directed them to Mintz Levin or Jerry Gotkin, a Mintz Levin attorney. (Id.). And, at least some Huron work product produced on or around May 5, 2006 was directed to Mintz Levin. (Mo. Ex. 19). It is undisputed that Huron did not sign a formal engagement letter with DHB until November 2006, by

which time Mr. Brooks was no longer DHB's Chief Executive Officer. At the evidentiary hearing, Mr. Brooks declined to call any representative from Huron or Mintz Levin who could clarify these ambiguities (Mr. Brooks did call Michelle Leinbach, a Mintz Levin records custodian, but her testimony did not enlighten the Court on these matters).

Considering the evidence and testimony received, the Court makes the following preliminary findings (subject to revision upon the introduction of further evidence): (1) Mintz Levin originally retained Huron on Mr. Brooks' behalf; and (2) on April 10, 2006, Huron's engagement with Mintz Levin terminated, and Huron began working for DHB directly. Consequently, the Court preliminarily finds that: (1) Mr. Brooks can assert privilege and/or work-product protection for Huron-created material generated before April 10, 2006,[4] unless he has waived these rights; (2) likewise, Mr. Brooks can assert privilege with respect to otherwise privileged communications between Mintz Levin or himself and Huron that took place before April 10, 2006; but (3) Mr. Brooks cannot assert privilege or work product protection for any Huron work performed on or after April 10, 2006.

There is one caveat with respect to (3). It _may_ be that

---

[4] Mr. Brooks, obviously, cannot claim any privilege with respect to non-privileged documents that Huron did not create, but merely received during the course of its Mintz Levin engagement, such as financial records originating from Mr. Brooks or DHB.

certain Huron work performed on or after April 10, 2006 impermissibly relied upon communications from Mr. Brooks' counsel and/or work product originally created on Mr. Brooks' behalf. And it likewise _may_ be that Mr. Brooks or his representatives did not consent to such usage of his protected attorney-client information and work product. In this regard, the Court notes that Mintz Levin's correspondence with Huron indicates that, even after commencing its DHB engagement, Huron remained in a privileged relationship with Mintz Levin (and thus Brooks) for "some of our prior communications." (HU0011). To the extent that Huron's DHB-work product impermissibly relied upon Mr. Brooks' privileged or work-product protected information, Mr. Brooks _may_ be able to claim privilege with respect to it; however, whether Mr. Brooks _actually_ can claim privilege will depend on other factors, such as whether Mr. Brooks knew that Huron was using his privileged/work product protected material and failed to object to such usage.[5] It is also possible that Mr. Brooks permitted Huron to use the work product it created on his behalf to assist DHB, but only as part of his joint defense agreement with DHB. Such a possibility is somewhat undercut by Huron's own belief that its relationship with DHB was

---

[5] Mr. Brooks' privilege log, on p. 7, indicates that Mr. Brooks believes that Huron's DHB work "relied upon work product created during privileged engagement." But Mr. Brooks needs to submit actual _evidence_ that this is the case, such as a declaration or testimony from the Huron individuals who actually performed the work.

non-privileged. (HUOO11). But it remains a possibility nevertheless.

At this point, however, the Court's discussion of (3) is only speculation. The Court has received no testimony from Huron or other individuals with personal knowledge concerning these matters. And none of the numerous documents that the parties have submitted suffices to sufficiently inform the Court with respect to them. Thus, for the time being, the Court cannot find that Mr. Brooks has met his burden in showing that he can assert privilege or work product with respect to any post-April 10, 2006 Huron material.

## 2. Was the Privilege Waived?

Mr. Brooks has established that he can assert privilege with respect to at least some Huron material (i.e., Huron-created documents pre-dating April 10, 2006). The question then turns to whether Mr. Brooks waived this privilege. The Court finds that he did not.

The April 10, 2006 e-mail authorizing Huron to work for DHB indicated that Huron would remain in a privileged relationship with Mintz Levin with respect to "some of our prior communications." (HUOO11). This suffices to show that Mr. Brooks and/or his counsel expected Huron to keep this material in confidence. And, to the extent that Huron then produced some of this material to the Government, this same e-mail suffices –

14

however minimally – to show that Huron lacked Mr. Brooks' consent to make such a production.

3.   Application to Mr. Brooks' Motion

There are some Huron documents that pre-date April 10, 2006 (for example, H-001649-1658).   Mr. Brooks can assert privilege/work product protection over these documents.   There are many other Huron documents, however, that are undated.   In order to assert privilege over these documents, Mr. Brooks must provide some evidence establishing that these documents were created during the course of Huron's engagement for Mintz Levin.

As per this ruling, Mr. Brooks cannot assert privilege with respect to any Huron document dated after April 10, 2006.

B.   Mintz Levin Documents Produced By Huron

In addition to Huron's own documents, Huron apparently gained possession of certain Mintz Levin documents, which Huron then produced to the Government at some point.   For example, most of Motion Exhibit 22 (H-00726-735; H-005037-005077; H-005119-5124)[6] appears to be Mintz Levin material protected by the attorney-client privilege or the attorney work-product doctrine generated between February 13, 2006 and March 30, 2006.   If Mr. Brooks or Mintz Levin shared this material with Huron contemporaneously with its creation

---

[6] In the privilege log submitted to the Court, Mr. Brooks' attorneys represented that the documents Bates-labeled "H" came from Huron.   The Court has no reason to doubt this representation.

(instead of months later, when Huron was working for DHB), then Mr. Brooks can assert privilege with respect to it. The Court, however, has no evidence concerning when Huron received these documents. And because a third party, Huron, already possesses them, Mr. Brooks must provide some evidence (such as a declaration from a Mintz Levin attorney indicating, to the best of his recollection, when and why this material was provided) that would enable the Court to make a privilege finding in Mr. Brooks' favor.

Motion Exhibit 22 also contains one memorandum dated April 21, 2006 (H-005078-5118). By this time Huron was working for DHB in what was, expressly, a non-privileged relationship (HU0011). Thus, Mr. Brooks must introduce evidence showing that this memorandum remained privileged despite Huron possessing it. Absent such evidence, the Court cannot make any privilege finding concerning it (or, for that matter, any other originally privileged material dated after April 10, 2006 that Huron possesses).

C.  Mintz Levin Documents Produced by DHB

Mr. Brooks' privilege log identifies a few DHB-produced Mintz Levin invoices. These invoices contain information which is arguably work product (i.e., descriptions of various tasks that Mintz Levin engaged in).[7] The invoices concern the "DHB Industries

---

[7] The Court notes, however, that Mintz Levin's descriptions of the various tasks performed are so general that – while these documents might constitute work product – it is difficult to see how the Government could use them to its advantage  Consequently, even if they are Mr. Brooks' protected work product, it is not

16

Inc." matter.  Some are directed to Mr. Brooks as DHB's "Chairman and Chief Executive Officer," while others are directed at Mr. Brooks personally.

From these invoices themselves, it is unclear whether they concern advice Mintz Levin provided to Mr. Brooks personally, or to Mr. Brooks in his capacity as DHB's Chairman and Chief Executive Officer.  So far, however, the Court is only aware of Mintz Levin's personal engagement with Mr. Brooks.  Thus, absent evidence to the contrary, the Court assumes that these invoices concern Mintz Levin's work for Mr. Brooks personally.  It follows that Mr. Brooks may originally have been able to claim privilege with respect to certain portions of these invoices.  <u>See Diversified Group, Inc. v. Daugerdas</u>, 304 F. Supp. 2d 507, 514 (S.D.N.Y. 2003) (invoices privileged if they reveal "litigation strategy, or the specific nature of the services provided"); <u>see also</u> <u>DiBella v. Hopkins</u>, 403 F.3d 102, 120 (2d Cir. 2005) (applying New York law to find that attorney invoices are privileged only if they provide "detailed accounts of the legal services rendered").  But, because the Government apparently obtained these documents from DHB,[8] Mr. Brooks must introduce evidence indicating that DHB's

---

likely that Mr. Brooks incurred any prejudice from their disclosure.

[8] The documents are stamped "DHB-GJ."  Thus, it is unclear where they originated from within DHB.  As discussed later on, a finding that DHB produced them from Mr. Brooks' company hard drive or e-mail account suffices to show that DHB's possession of

17

possession of them did not waive their protected status.  To date,
he has failed to do so.  Thus, the Court cannot make a privilege
finding in Mr. Brooks' favor with respect to these documents.

D.  <u>Schlam Stone Documents</u>

In April 2004, Mr. Brooks retained the law firm of Schlam
Stone to represent him.  Schlam Stone, in turn, retained the Stroz
Friedberg accounting firm to assist in Mr. Brooks' representation.
At the evidentiary hearing, James Sherwood, a Schlam Stone partner,
identified 59 documents as being the work product of either Schlam
Stone or Stroz Friedberg.  (Tr. 27-67).  Mr. Sherwood further
indicated that "each and every one" of these communications were
privileged.  (Tr. 67).  The Government sought to impeach Mr.
Sherwood's identifications, on the grounds that he could not
remember any specific Stroz Friedberg documents, and likewise could
not remember being present at any specific document's creation.
The Government's attempt to impeach him notwithstanding, the Court
credits Mr. Sherwood's testimony.  After five years, it is
understandable, indeed, inevitable, that Mr. Sherwood did not
photographically remember individual documents (mostly nondescript
spreadsheets), or the circumstances of those documents' creation.
Privilege and work product protections do not disappear simply
because a party's lawyer lacks the superhuman capacity to recall
every detail concerning every scrap of paper generated during the

---

them did not waive Mr. Brooks' privilege rights.

course of a representation. Here, Mr. Sherwood testified, under oath, that he could identify the documents' source based on the documents' format. And Mr. Sherwood further testified that he remembered being present while spreadsheets similar to the ones introduced were generated. In the Court's view, this is sufficient to establish that the 59 documents which Mr. Sherwood identified originated from Schlam Stone or Stroz Friedberg, in connection with the Brooks representation. Thus, at least originally, these documents were protected by the attorney-client privilege and/or the attorney work product doctrine.

That being said, Mr. Brooks may have waived privilege with respect to many of these documents. First, Mr. Sherwood conceded that certain Schlam Stone or Stroz Friedberg documents may have been shared with either FTI (the auditor for DHB's Audit Committee) or the SEC.[9] But, because several years have passed, Mr. Sherwood could not recall what specific documents were shared with FTI or the SEC, and thus were no longer privileged. The Court, however, notes that at least some of the documents identified on Mr. Brooks' privilege log appear to be substantively identical to documents produced by FTI (although sometimes with

---

[9] Mr. Brooks does not dispute that the act of providing documents to the SEC normally waives privilege. His objection is that DHB, Huron (and possibly other entities) engaged in an unauthorized production of his privileged documents, and lacked the legal ability to waive privilege on his behalf. See July 10, 2009 Letter (Docket No. 431) at 9.

minor non-substantive differences, such as page spacing and time stamping).  Of the documents identified on Mr. Brooks' privilege log, or submitted as exhibits, the following Bates ranges fall into this category:

DHB-DOJ-DMS:    47756-59, 546816-27, 546831, 546833, 546838-46, 546853, 546900-911, 546917, 546937, 546915, 546922-26, 546959, 665194-95;

DHB-DOJ-NYS:    66329-30, 66343, 66345, 66350-54, 66364.[10]

Because these documents are identical to FTI-produced documents, the evidence suggests that they were among the documents that Mr. Brooks' legal team voluntarily produced to FTI.  Thus, Mr. Brooks waived work product protection with respect to these Bates numbered pages.

In addition to these documents, there are other Schlam Stone and/or Stroz Friedberg documents that – while not identical to the FTI-produced documents – appear very similar to them.  Thus, at least theoretically, Mr. Brooks may have negated his right to protect these documents through the subject matter waiver doctrine.  But, based on the facts presented so far, the Court declines to find that Mr. Brooks engaged in a subject matter waiver with respect to these documents.  In the work product (as opposed to attorney-client privilege) context, courts generally find "implied

_____

[10] These documents are substantively identical to FTI 47-50, 1575, 2943, 2945-2955, 2957, 2959, 2963-2966, 3004-3008, 3101, and 3157.

or subject-matter waiver only where the privileged communications have affirmatively been put at issue or when the defendant seeks to exploit the doctrine for a purpose inconsistent with the privilege, such as for the unilateral testimonial use of privileged communications." The Shinnecock Indian Nation v. Kempthorne, __ F.2d __, 2009 WL 2873174, *14 (E.D.N.Y. Sep. 9, 2009) (Bianco, J.) (collecting cases). Here, Mr. Brooks – to date – has not sought to use the Schlam Stone and/or Stroz Friedberg documents to affirmatively bolster his legal defense. Instead, he seeks to suppress the introduction of all such documents. Furthermore, there may have been very good non-strategic reasons why these documents were never shared with FTI. It could be, for instance, that these documents consist of works-in-progress which include computational or typographical errors. In this regard, the Court notes that Mr. Sherwood testified that he disclosed only finished documents, and "no drafts or work product or confidential things" or "unfinished work product" to FTI. (Tr. 238). In any event, the Court finds that – so far – the evidence does not support a finding of subject matter waiver with respect to these documents.[11]

---

[11] The Government's March 17, 2009 letter inaccurately claims that Ms. Grunberg testified at the evidentiary hearing that "all of the Stroz Freiberg [sic] drafts were provided to both FTI and to the SEC." Thus, the Government contends that Mr. Brooks waived privilege with respect to all the Stroz Friedberg documents. But, in actuality, Ms. Grunberg only testified that DHB's counsel produced "all" of "the Stroz Friedberg work product that had been given to FTI." (Tr. 292) (emphasis supplied). Ms. Grunberg's testimony thus concerned a subset of Stroz Friedberg

There is, however, a second issue in play: DHB produced all of the Schlam Stone and Stroz Friedberg documents at issue. Thus, Mr. Brooks must show that these documents remain privileged despite DHB's possession of them.

Some of these memorandums were found on Mr. Brooks' own hard drive (i.e., DHB-DOJ-DHB 022449-022483). The Government contends that, by storing copies of these memorandums on his company computer, Mr. Brooks shared these documents with DHB. In this regard, the Government notes that DHB's Computer Usage Policy expressly warned employees that they should use their computers solely for "business purposes" and that they "should not assume that any computer equipment or technologies such as electronic mail and data are confidential or private." (Gov. Ex. 8). Thus, the Government contends that Mr. Brooks waived privilege with respect to these documents. Mr. Brooks responds these documents remained privileged, even though he maintained them on a DHB-owned computer. The Court agrees with Mr. Brooks.

"Neither the Second Circuit nor the New York Court of Appeals has specifically addressed the extent to which information stored on an employer's computer system can be a confidential communication for purposes of the attorney-client privilege." Orbit One Communications, Inc. v. Numerex Corp., 255 F.R.D. 98, 107

---

documents: the particular documents that Stroz Friedberg chose to share with FTI. And Ms. Grunberg did not testify about how large this subset was, or what it consisted of.

-108 (S.D.N.Y. 2008).[12] Lacking such definitive guidance, courts instead have considered whether documents maintained on a company computer system remain privileged on a case-by-case basis, under general privilege principles. Specifically, courts have sought to determine whether the employee, as a practical matter, had a reasonable expectation that the attorney-client communications would remain confidential despite being stored on a company's computer system. In this regard, some courts have considered the following four factors: (1) does the corporation maintain a policy banning personal or other objectionable use; (2) does the company monitor the use of the employee's computer or e-mail; (3) do third parties have a right of access to the computer or e-mails; and (4) did the corporation notify the employee, or was the employee aware,

---

[12] Although not in the privilege context, the Second Circuit has recognized that employees sometimes have a reasonable expectation of privacy in the contents of their work computers. See Leventhal v. Knapek, 266 F.3d 64, 74 (2d Cir. 2001). This seems to suggest, at a minimum, that the Second Circuit would disfavor a rule that an employee automatically waives privilege by storing personal legal documents on a company computer. Other circuits have split on this question. Compare U.S. v. Ziegler, 474 F.3d 1184, 1190 (9th Cir. 2007) (employee had reasonable expectation of privacy in the contents of his office computer); with Muick v. Glenayre Electronics, 280 F.3d 741, 743 (7th Cir. 2002) (no expectation of privacy in the contents of a company computer); U.S. v. Simons, 206 F.3d 392, 398 (4th Cir. 2000) (defendant's Fourth Amendment rights not violated because, under company computer usage policy, he lacked a legitimate expectation of privacy with regard to the files he downloaded from the Internet).

of the use and monitoring policies?[13] See, e.g., Curto v. Medical World Communications, Inc., 03-CV-6327, 2006 WL 1318387, *2-3 (E.D.N.Y. 2006); Geer v. Gilman Corp., 06-CV-0889, 2007 WL 1423752, *3-4 (D. Conn. 2007) (Margolis, M.J.) (party did not waive privilege by using her fiance's computer and e-mail account). After applying these four factors, or privilege principles generally, most – but not all – courts have held that employees do not waive privilege simply by maintaining documents on a company computer system. See Orbit One Communications, Inc., 255 F.R.D. at 107-08 (S.D.N.Y. 2008); Curto, 2006 WL 1318387 at *4-8; In Re Asia Global Crossing, Ltd., 322 B.R. 247, 259-61 (S.D.N.Y. Bnkr. 2005); but see Long v. Marubeni America Corp., 05-CV-639, 2006 WL 2998671, *2-3 (S.D.N.Y. 2006); Scott v. Beth Israel Medical Center Inc., 847 N.Y.S.2d 436, 439 (N.Y. Sup. Ct., N.Y. Cty. 2007).

Applying these four (advisory) factors, the Court concludes that, on balance, they slightly favor Mr. Brooks' position:

(1) Did DHB maintain a policy banning personal or other objectionable use?

Under DHB's Computer Usage Policy ("Policy"), employees were "expect[ed]" to use their company equipment "solely for business purposes." (Gov. Ex. 8). However, aside from this "expect[ation]," the Policy set forth several specific activities

---

[13] Because the Second Circuit has never applied this four-factor test, the Court construes it as being strictly advisory.

24

that are "strictly prohibited." (Id.). These "strictly prohibited" activities include installing "pirated" software products, introducing computer viruses into DHB's network, engaging in sexual harassment, and sending junk mail. (Id.). And, elsewhere, the Policy identifies other prohibited activities – such as playing computer games or viewing internet pornography. But the Policy does not expressly prohibit employees from using their company computers to conduct personal legal matters. Indeed, the Policy is silent about such usage. Accordingly, the Court concludes that, while DHB did not "expect[]" employees to use their company equipment to assist conducting personal legal matters, it never actually "bann[ed]" employees from doing so. Thus, the first factor favors Mr. Brooks.

(2) Did DHB monitor the use of the employee's computer or e-mail?

The Policy indicates that, with respect to the intranet or internet, DHB "will periodically review the information or sites a user has visited." (Id.) Under the Policy, DHB also has the "right and ability to enter" its computer systems, and to monitor employee e-mail messages specifically. (Id.) But, unlike with respect to intranet and internet usage, the Policy nowhere expressly indicates that DHB will monitor employee computer hard drive or e-mail files, only that it has the right to do so. And there is no evidence that the Company did, in fact, monitor such files. (See, generally, Tr. 384-85) (Ms. Grunberg testified that

she had no knowledge regarding whether the policy was ever enforced). Here, the privilege documents originated from Mr. Brooks' computer hard drive, not from his intranet or internet usage. Thus, this factor also tips in Mr. Brooks' favor.

(3) Did DHB or other third parties have a right of access to the computer or e-mails;

As discussed above, DHB unquestionably had a <u>right</u> to access Mr. Brooks' computer. Accordingly, this factor tips against a finding of privilege.

(4) Did DHB notify Brooks, or was Brooks aware, of the use and monitoring policies?

There is little evidence with respect to this factor. Nothing in the record directly evidences, one way or the other, whether Mr. Brooks personally knew about the Policy. (<u>See</u> Tr. 385-386) (indicating that "some" DHB employees received the Policy). The Court notes, however, that Mr. Brooks was not a mere DHB employee. He was DHB's Chairman and CEO, and DHB's Computer Usage Policy was implemented under his watch. Consequently, the Court believes it is fair and logical to presume that Mr. Brooks had knowledge of it – absent any evidence to the contrary.

(5) How did DHB interpret its Computer Usage Policy?

To the four advisory factors listed above, the Court, in this case, believes it is appropriate to add a fifth and ultimately deciding factor: with respect to privilege issues, how did DHB interpret its computer usage policy? Here, the evidence

unambiguously shows that DHB believed that employees did not forfeit applicable privileges by maintaining personal legal documents on their company computers. At the evidentiary hearing, DHB's counsel, Ms. Grunberg, testified that communications between Mr. Brooks and his counsel, stored on DHB computers or servers, should have been withheld based on attorney-client privilege, but were inadvertently produced. (Tr. 275, 279). Indeed, Ms. Grunberg specifically testified that the privilege review her firm conducted on DHB's behalf was not limited to DHB's privilege, but extended to "individuals' privileges as well." (Tr. 281). If DHB understood its computer usage policy to mean that DHB employees waive privilege by storing personal documents on DHB computers, such a review for "individuals' privileges" would not only have been unnecessary, it would have violated DHB's legal obligation to produce all non-privileged responsive documents requested by a subpoena. Conversely, if DHB understood its computer usage policy to <u>not</u> affect its employees' legal privileges, it would have acted exactly as it did – carefully screening out material protected by "individuals' privileges" from any document production it made.

Thus, in asking the Court to find that Mr. Brooks waived privilege simply because he maintained certain documents on his DHB hard drive, the Government is essentially asking the Court impose a much harsher and more restrictive computer usage policy than DHB ever intended. But Mr. Brooks, at most, can be charged with having

knowledge of DHB's <u>actual</u> usage policy, as understood by the Company itself, not as interpreted by Government lawyers. It is fundamentally unfair to subject him to the consequences of waiving privilege based on a strict, theoretical interpretation of DHB's Computer Usage Policy that was never imagined by DHB itself and, in fact, contradicted by DHB's own actions.[14]

Based on these five factors, the Court finds that Mr. Brooks did not waive privilege with respect to otherwise privileged or work-protected documents stored on his DHB computer.[15]

In addition to documents stored on Mr. Brooks' own hard drive, Mr. Brooks also claims privilege or work-product protection with respect to several documents produced from the hard drive of

---

[14] This fifth factor, as applied by the Court, could be seen as a clarification of the first factor. After all, if a company chooses to reasonably interpret its own internal policies liberally, then those policies "exist" only to the extent that they are actually interpreted and implemented, and do not extend as far as an outside party (such as the Government) might wish them to.

[15] Although not relevant to this case, the Court notes that a general rule holding that individuals waive privilege by storing personal documents on a company computer could have significant unintended but very damaging consequences. As much as companies expect their employees to devote the full working day to business matters, it is indisputable that employees with pressing personal legal affairs (<u>i.e.</u>, a divorce, a lawsuit) sometimes feel the need to communicate with their counsel while at work. This, in turn, may lead to files or file fragments being stored on a company computer or e-mail server (even if the employee attempts to delete the file or e-mail). Creating a broad waiver rule would not only impose a severe legal prejudice for nothing more than a (possible) violation of a company's internal policy, it could also subject companies to third party subpoenas seeking "waived" privileged documents.

Dawn M. Schlegal (i.e., the "DMS" documents). During the relevant time period, Mr. Brooks participated in a joint defense agreement with Ms. Schlegal. (Tr. 180-181; 263). As far as this Court knows, that joint defense agreement remains in place. There is no direct evidence indicating that Mr. Brooks or his counsel provided Ms. Schlegal with the "DMS" documents pursuant to that joint defense agreement.[16] But – absent evidence to the contrary – it is more than reasonable for the Court to infer that this is the case. After all, there is ample evidence supporting that Mr. Brooks at least partially coordinated his defense with Ms. Schlegal, and the sharing of privileged and work-product material would certainly facilitate this goal. Conversely, the Court cannot even speculate as to what other purposes Mr. Brooks might have had in sharing these documents with Ms. Schlegal. Thus, as of now, the Court believes that Mr. Brooks has met his burden in establishing that he did not waive any otherwise applicable privilege or work product protection with respect to the DHB "DMS" documents.

The issue is different with respect to documents that DHB produced from sources other than Mr. Brooks' or Ms. Schlegal's hard drives. Based on DHB's Bates numbering system, Mr. Brooks

---

[16] Mr. Brooks' former counsel, James Sherwood, was asked if he provided "FTI spreadsheets" to Ms. Schlegel pursuant to the joint defense agreement, and Mr. Sherwood indicated that he did not know. (Tr. 265). But Mr. Brooks does not claim any privilege or work-product protection for any "FTI" spreadsheets produced from the "DMS" hard drive, although he does make such a claim with respect to spreadsheets prepared by Stroz Friedberg.

claims privilege or work-product protection for several documents produced from the hard drives of DHB employees Christine Callahan (Bates labeled "CXC") and Teddy Twail (Bates labeled "TXT"), and possibly other DHB sources (the "NYS" Bates label). Mr. Brooks never entered into a joint defense agreement with Ms. Callahan or Mr. Twail. (Tr. 185). And, even after a four-day evidentiary hearing, the Court still has no idea who these individuals are. Likewise, the Court remains baffled as to why or how Mr. Brooks' otherwise privileged or work-product protected material ended up in the "CXC," "TXT" and "NYS" sources. Unless Mr. Brooks presents an explanation (supported by evidence) for how and why Ms. Callahan, Mr. Twail, and "NYS" received his privileged or work-product protected information, the Court cannot find – with respect to the Schlam Stone and Stroz Friedberg documents – that these documents remain privileged.[17]

     E.   <u>Milbank, Tweed, Hadley & McCloy, LLP Documents</u>

Mr. Brooks' privilege logs also identifies several documents created by Milbank, Tweed, Hadley & McCloy, LLP ("Milbank Tweed"). These documents consist of: (i) an outline raising a series of questions that should be answered in preparing Mr. Brooks' defense strategy; (ii) a draft complaint in <u>DHB Industries</u>

---

[17] It may, of course, be that Mr. Brooks provided these documents to DHB pursuant to a joint defense agreement, and that DHB then shared these documents with its employees. But the Court has no evidence that this is the case.

v. Weiser LLP; (iii) several draft employment agreements between Mr. Brooks and DHB; (iv) a draft letter from Mr. Brooks to Sandra Hatfield regarding the employment agreement; (v) a chart of ongoing lawsuits involving Mr. Brooks; and (vi) Mr. Brooks' engagement letter with Milbank Tweed.

With respect to (i), Mr. Brooks has provided a testimonial stipulation (Def. Ex. 222) from George Cancellos, Esq., a Milbank Tweed attorney, that he and a colleague prepared the document and provided it to Mr. Brooks as part of their privileged representation of him. And, although DHB produced the document, it did so from Mr. Brooks' personal hard drive. Thus, based upon the evidence currently before the Court, Mr. Brooks can assert privilege over this document.

As far as the Court can tell, Mr. Brooks never provided the Court with copies of (ii), (iv) or (v). Thus, the Court cannot make any privilege findings with respect to them.

Mr. Brooks did submit (iii) as exhibits. But, unlike with respect to (i), he provided no testimonial stipulation, or any other evidence, concerning these documents. And the Court cannot determine, on the face of these draft employment agreements, that they are privileged. After all, there are two kinds of draft employment agreements: (a) internal drafts exchanged between an attorney and his client; and (b) external drafts, which are exchanged between the parties negotiating the agreement. External

drafts are not privileged, as they are shared with an adversarial party rather than kept in confidence. Here, the Court cannot decipher whether Milbank Tweed communicated these draft agreements to Mr. Brooks alone, or merely provided Mr. Brooks with copies of drafts it sent to DHB during the course of negotiations. Indeed, some of these drafts may not have originated with Milbank Tweed at all, but rather with the DHB attorneys that Milbank Tweed negotiated with. Thus, without more evidence concerning the nature of these documents, the Court cannot find that Mr. Brooks can assert privilege over them.

Milbank Tweed's engagement letter to Mr. Brooks (vi) does not convey any legal advice. Rather, it merely sets forth, in extremely general terms, the scope of Milbank's engagement. Thus, it is not privileged. <u>Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.</u>, 258 F.R.D. 95, 103 (S.D.N.Y. 2009) (draft engagement letters which contained "no legal analysis" were not privileged).

F.   <u>Alleged Joint Defense Communications Between Mr. Brooks and/or his Attorneys and Other Persons or Entities</u>

Mr. Brooks' privilege log identifies several documents as privileged under unwritten joint defense agreements he reached with several other parties.

"The joint defense privilege . . . serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy

32

has been decided upon and undertaken by the parties and their respective counsel." U.S. v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989). It protects "only those communications made in the course of an ongoing common enterprise and intended to further the enterprise." Id. A member of a joint defense agreement can waive the privilege with respect to its own communications, but typically cannot disclose privileged information received from other joint defense agreement members. See, generally, U.S. v. Agnello, 135 F. Supp. 2d 380, 383 (E.D.N.Y.,2001) (Gershon, J.); U.S. v. Salvagno, 306 F. Supp. 2d 258, 273 (N.D.N.Y. 2004) (denying request for an evidentiary hearing because the Government took steps to ensure that cooperating defendant did not breach joint defense agreement); In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910, 922 (8th Cir. 1997). If, however, a member of a joint defense agreement withdraws from the agreement and takes a litigation position directly adverse to the other members of the agreement, he may forfeit the agreement's protections. See U.S. v. Almeida, 341 F.3d 1318, 1322-23 (11th Cir. 2003) (cooperating defendant waived rights under joint defense agreement by testifying against fellow members of the agreement).

Here, the evidence to date establishes that Mr. Brooks (represented by multiple counsel, including Schlam Stone, Milbank Tweed, and Venable LLP) entered into a joint defense agreement (or, as seems more likely, multiple and overlapping joint defense

agreements) with DHB (represented by Jenner & Block and, at times, by Venable), Dawn Shlegel (represented by Kobre Kim LLP, and by attorney Vic Rocco as well), Sandra Hatfield (represented by Sercarz & Riopelle LLP), Patricia Lennex (Hatfield's sister) (Briefly represented by Sercarz & Riopelle LLP), and which also included attorney David Rosen. (Tr. 80, 81, 180-81, 243, 244, 254-56, 263; Def. Ex. 316-322). The evidence further indicates that this joint defense agreement (or agreements) commenced no later than June 1, 2006, and continued until at least October 20, 2006, operating on a communication-by-communication basis. And there is no evidence that Mr. Brooks ever forfeited the protections of these agreements. Based on the joint defense agreement or agreements that Mr. Brooks entered into, the Court finds that the following Bates ranges identified on Mr. Brooks' privilege log remain privileged, notwithstanding their disclosure to fellow members of a joint defense agreement: DHB-DOJ-DHB 010547-62. Mr. Brooks' privilege log also identifies other documents as being purportedly protected by the joint defense privilege. But the Court does not believe that Mr. Brooks ever provided it with copies of these documents. Thus, it cannot make any privilege findings with respect to them.

Conversely, the evidence refutes Mr. Brooks' contention that he entered into a joint defense agreement with DHB's Audit Committee or the Audit Committee's accounting firm, FTI, and

further refutes any suggestion that Huron, Rachlin LLP or Tatum LLC participated in the joint defense agreement. (Tr. 80, 83, 185, 187, 210-11, 290-91, 295); <u>see</u> <u>generally Medinol, Ltd. v. Boston Scientific Corp.</u>, 214 F.R.D. 113, 116 (S.D.N.Y. 2002) ("in order for auditors to properly do their job, they must not share common interests with the company they audit"). Thus, Mr. Brooks cannot assert the joint defense privilege with respect to any documents he shared with these entities.

G. <u>Vance Material</u>

In June 2008, the Court modified Mr. Brooks' bail conditions to require Mr. Brooks to employ a private, Government-approved security firm to monitor his telephone calls and faxes, except for attorney-client communications. Vance was selected for this role.

Although Vance was instructed not to hand privileged materials over to the Government, Mr. Brooks alleges that it handed over more than 200 attorney-client communications to the Government, and that the Government failed to return these materials to him. The Government takes no position regarding whether these materials are privileged, although it has conceded that many of them contain communications between Mr. Brooks and his attorneys and has agreed to return them, in their entirety, to Mr. Brooks. (Gov. Letters dated Jan. 30, 2009, Feb. 6, 2009, Feb. 11, 2009). The Government, however, proffers that "the Vance materials

were never reviewed in any context by anyone in the Government."
(Gov. Letter dated Jan. 30, 2009).  Unless Mr. Brooks can provide
some evidence to the contrary, the Court considers this matter
closed.

III.  <u>Miscellaneous Issues</u>

    In addition to the matters addressed above, the parties
have also raised a few other legal arguments, which the Court
addresses below.

    Mr. Brooks argues that Venable was "hopelessly
conflicted" and "breached its duty of loyalty and confidentiality"
to Mr. Brooks because it represented him before representing DHB.
<u>See</u> July 17, 2009 Letter at 7, 13.  Mr. Brooks further argues that,
although he agreed to prospectively waive any conflict that might
arise between him and DHB, his prospective waiver was "invalid and
unenforceable" because he could not give "informed consent to a
conflict which had not yet occurred." <u>Id</u>. at 13.  But Mr. Brooks
cites no case law to support this argument.  This is not
surprising: although courts appear to disfavor prospective waivers,
they are not <u>per</u> <u>se</u> invalid.  <u>See</u>, <u>e.g.</u>, <u>Celgene Corp. v. KV
Pharmaceutical Co.</u>, 07-CV-4819, 2008 WL 2937415, *9 (D.N.J. July
28, 2008) ("[t]he effectiveness of [prospective] waivers is
generally determined by the extent to which the client reasonably
understands the material risks that the waiver entails") (citing
Model Rules of Professional Conduct R. 1.7 cmt. 22 (2004)); <u>Visa</u>

U.S.A., Inc. v. First Data Corp., 241 F. Supp. 2d 1100, 1105 (N.D. Cal. 2003) ("An advance waiver of potential future conflicts, such as the one executed by First Data and Heller, is permitted under California law, even if the waiver does not specifically state the exact nature of the future conflict."). Mr. Brooks also contends that his prospective waiver was invalid under D.C. law, which Ms. Grunberg was obliged to follow as a D.C.-admitted lawyer. This argument also fails. In fact, Opinion 309 of the District of Columbia Bar Legal Ethics Committee makes clear that Venable's potential conflict between Mr. Brooks (a former client, after August 13, 2004) and DHB (a current client) is precisely the kind that <u>can</u> be waived, stating that "[a] conflict of interest under Rule 1.9 (former client) also may be waived." It then goes on to state that: "Advance conflict waivers have been sustained where the potential adverse party was known and identified, the client giving the waiver was sophisticated, and the waiver had been reviewed by the client's in-house counsel." <u>Id.</u> Here, the adverse party (<u>i.e.</u>, DHB) was "known and identified," Mr. Brooks himself was a sophisticated businessman (who presumably understood that individuals can, by contract, agree to waive their rights), and – as far as the Court can tell – Mr. Brooks had every opportunity to have his prospective waiver reviewed by counsel. Furthermore, although Mr. Brooks' prospective waiver did not identify any specific subject matter, Venable's alleged conflict arose from the

same issues that had led to it ceasing its representation of him in favor of DHB. Thus, Venable was not "hopelessly conflicted," and Mr. Brooks prospective waiver was valid.[18]

Mr. Brooks also argues that the Government somehow erred in reviewing documents that stated, on their face, that they were attorney-client privileged or attorney work product. This argument is frivolous. Documents do not become privileged simply because someone stamps "attorney-client privilege," "privileged and confidential" or "attorney work-product" on them. And parties frequently place these designations on plainly non-privileged material. Indeed, in this case, the Government has adduced evidence that Huron stamped <u>everything</u> privileged and work product even though its engagement with DHB was expressly non-privileged. (Ex. C. to Gov. Letter dated February 11, 2009).

For its part, the Government argues that – even if Mr. Brooks did not originally waive privilege by disclosing documents to DHB or Huron – Mr. Brooks waived privilege when these entities subsequently turned over Mr. Brooks' privileged material to the Government, and Mr. Brooks failed to object. For now, the Court rejects this argument. There is no evidence that Mr. Brooks authorized DHB or Huron to disclose his privileged documents to the Government. <u>See</u> <u>In re Parmalat Sec. Litig.</u>, 04-MD-1653, 2006 WL

---

[18] Even if Mr. Brooks' prospective waiver was invalid, it is unclear what, if any relief, would flow from such a finding.

3592936, *4 (S.D.N.Y. 2006) (Pittman, M.J.) (holding that an unauthorized disclosure of privileged documents does not automatically waive the privilege). And, although Mr. Brooks waited a long time to object to these disclosures, there is no evidence that Mr. Brooks knew, or had reason to know, that these unauthorized disclosures were made in the first place. On the contrary: the evidence <u>to date</u> indicates that Mr. Brooks acted promptly to address his privilege concerns after he learned that DHB and Huron had made allegedly improper disclosures. (<u>See</u> Tr. 189; Docket No. 232); <u>In re Parmalat Sec. Litig.</u>, 2006 WL 3592936 at *4 (after unauthorized disclosure, a privilege holder must take steps "reasonably designed to protect and preserve the privilege") (internal citations and quotations omitted). A privilege holder obviously cannot be charged with failing to object to an unauthorized disclosure until he knows, or has reason to know, that the unauthorized disclosure occurred. That being said, the Court stresses that this finding is preliminary. If the Government introduces evidence (such as the cover letters it provided with the relevant productions), showing that it produced the material at issue to Mr. Brooks many months before Mr. Brooks raised his privilege objections, then the question of whether Mr. Brooks acted with reasonable diligence in asserting the privilege may be revisited.

IV.  <u>The Need for Another Hearing</u>

As discussed throughout this opinion, the Court needs more evidence before it can make any final privilege determinations.  That being said, it appears highly likely that the Government acquired at least some of Mr. Brooks' privileged and/or work product-protected documents.  During this hearing, the Court will be open to new factual evidence concerning all the matters addressed in this opinion.  But the following outstanding issues are of specific concern to the Court:

(1)  When did Huron's Mintz Levin engagement, on Mr. Brooks' behalf, truly end? What is Huron's own position on this matter (<u>i.e.</u>, what would testimony or declarations from the relevant Huron personnel reveal)?

(2)  Did Huron's work for DHB rely upon the work it originally undertook during its Mintz Levin engagement?

  (a)  If "yes" to (2), did Mr. Brooks know, or have reason to know, that Huron was using his work product on DHB's behalf?

  (b)  If "yes" to (2) and (2)(a), did Mr. Brooks consent to Huron's use of his work product?  If he did not consent, did he take any concrete measures to oppose the use of his work product?

(2)  When were the undated Huron documents originally created?

(3)  How and when did Huron obtain the Mintz Levin documents within its possession?

(4)  What was the original source of the "DHB-GJ" and the "DHB-NYS" documents? Were these documents produced from Mr. Brooks' company computer or e-mail account? Or were they produced from elsewhere?

(5)  To the extent that DHB produced Mr. Brooks' otherwise privileged documents from sources besides his own computer or e-mail account (e.g., "CXC," "TXT," possibly

"GJ" and "NYS"), how and why did DHB (including Ms. Callahan and Mr. Twail) receive these documents? Was it pursuant to a joint defense agreement, or for some other reason?

(6) When did the Government produce the documents at issue to Mr. Brooks?

(7) During the course of its investigation and prosecution of Mr. Brooks (and Ms. Hatfield), what steps did the Government take to make sure that the relevant prosecutorial team did not review privileged materials that were accidentally or improperly produced?

(8) What, if any, prejudice have Mr. Brooks and Ms. Hatfield suffered as a result of the Government obtaining their privileged documents?

Given the number of issues outstanding, this hearing has the potential to become unwieldy. Thus, the Court strongly urges that the parties agree to streamline it as much as possible. For example, declarations, affidavits or testimonial stipulations (akin to Def. Ex. 222) might prove a more efficient way to introduce evidence than live witnesses testimony.

The Court will hold a hearing on the above issues on November 30 and December 1, 2009 at 9:30 a.m. The Court expects to complete the hearing by December 1. No adjournments will be granted. Ms. Hatfield is directed to appear personally.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    Central Islip, New York
          November  13 , 2009

41