UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
UNITED STATES OF AMERICA,

        -against-
                                   <u>MEMORANDUM AND ORDER</u>
                                   06-CR-0550 (JS)(AKT)

SANDRA HATFIELD, DAWN SCHLEGEL, and
DAVID H. BROOKS,

                  Defendants.
-----------------------------------X
APPEARANCES

For the Government: James Halleron Knapp, Esq.
                  Mary M. Dickman, Esq.
                  Richard T. Lunger, Esq.
                  Bonni Jessica Perlin, Esq.
                  Christopher Charles Caffarone, Esq.
                  Christopher Allen Ott, Esq.
                  James M. Miskiewicz, Esq.
                  Kathleen Anne Nandan, Esq.
                  Laura D. Mantell, Esq.
                  Marshall L. Miller, Esq.
                  Patrick Sean Sinclar, Esq.
                  United States Attorneys Office
                  Eastern District of New York
                  610 Federal Plaza
                  Central Islip, NY 11722


For Defendants:
Sandra Hatfield       Maurice H. Sercarz, Esq.
                  Roland G. Riopelle, Esq.
                  Sercarz & Riopelle
                  810 Seventh Ave, Suite 620
                  New York, NY 10019

                  W. Thomas Dillard, Esq.
                  Ritchie, Dillard & Davies, P.C.
                  606 W. Main Street, Suite 300
                  Knoxville, TN 37902

| | |
|---|---|
| Dawn Schlegel | Ian Nathaniel Levy, Esq. |
| | Sullivan & Cromwell |
| | 125 Broad Street |
| | New York, NY 10004 |
| | |
| | Steven Gary Kobre, Esq. |
| | Calvin Kai-Xin Koo, Esq. |
| | Robert W. Henoch, Esq. |
| | Kobre & Kim LLP |
| | 800 Third Avenue |
| | New York, NY 10022 |
| | |
| | W. Thomas Dillard, Esq. |
| | Ritchie, Dillard & Davies, P.C. |
| | 606 W. Main Street, Suite 300 |
| | Knoxville, TN 37902 |
| | |
| David Brooks | Gerald L. Shargel, Esq. |
| | Winston & Strawn, LLP |
| | 200 Park Avenue |
| | New York, NY 10166-4193 |
| | |
| | Jeffrey Ehrlich Alberts, Esq. |
| | Pryor Cashman LLP |
| | 7 Times Square |
| | New York, NY 10036 |
| | |
| | Steven Joseph Czik, Esq. |
| | Czik Law PLLC |
| | 101 Avenue Of The Americas, 15th Floor |
| | New York, NY 10013 |

SEYBERT, District Judge:

Before the Court is its final task in sentencing defendants David Brooks ("Brooks"), Sandra Hatfield ("Hatfield"), and Dawn Schlegel ("Schlegel" and collectively with Brooks and Hatfield, "Defendants"). Pursuant to the Mandatory Victims Restitution Act, the Court must determine what amount of money, if

any, Defendants must pay in restitution to the victims of their crimes. As explained fully below, the Court RESERVES JUDGMENT with respect to the amount of restitution owed to any victim because there is insufficient evidence in the record to determine the amount of restitution owed to the shareholders of common stock in DHB Industries, Inc. ("DHB" or the "Company"). Accordingly, the Court requires a corrected submission from the Government regarding an appropriate calculation.

<u>BACKGROUND</u>

The Court assumes familiarity with the facts of this case and only discusses those facts insofar as they are relevant to its decision today.

In October 2007, the Government charged Defendants with numerous crimes, including securities fraud, mail fraud, wire fraud, and insider trading. The offenses underlying the indictment of Brooks, Hatfield, and Schlegel occurred while the three were the CEO, COO, and CFO, respectively, of DHB. Evidence at trial demonstrated that the fraud Defendants perpetrated on DHB and its shareholders was pervasive, diverse, sophisticated, and severe. Of the many fraudulent schemes Defendants used to enrich themselves at the Company's expense, the more notable ones include: orchestrating personal sales of DHB common stock based upon inside information; overstating the value of DHB's inventory; reclassifying DHB's cost of goods sold account as R&D expense to

3

increase gross profit margin; looting the Company through unauthorized compensation and personal use of Company assets; and contracting with Tactical Armor Products, a company owned by Brooks' former wife, to perform sewing services at an incredibly inflated cost.

Shortly after indictment, Schlegel pled guilty to one count of conspiracy to commit securities fraud and one count of conspiracy to commit tax fraud. Brooks and Hatfield proceeded to trial. On September 14, 2010, a jury convicted Brooks of counts 1-11 and 15-17 of the Indictment, including all counts that alleged securities fraud, mail fraud, wire fraud, and/or conspiracy to commit those crimes. The jury convicted Hatfield of counts 1-2 and 12-16 of the Indictment.[1]

On August 15, 2013, this Court sentenced Brooks to seventeen years in prison, to be followed by five years of supervised release. (Docket Entry 1706.) On May 9, 2014, the Court sentenced Hatfield to seven years in prison, to be followed by three years of supervised release. (Docket Entry 1816.) On November 5, 2014, the Court sentenced Schlegel to time served and three years of supervised release. (Docket Entry 1843.) In all

---

[1] Throughout this Memorandum and Order, the Court refers to the crimes to which Defendants plead guilty or of which they were convicted as the "Offenses of Conviction."

cases, the Court ordered restitution in an amount to be determined at a later date.

In an effort to streamline any future restitution hearing, the Court, at a status conference on October 29, 2013, ordered the parties to file memoranda regarding the legal issues related to restitution. On November 25, 2013, Brooks and the Government identified and briefed the remaining issues, both relying heavily upon prior submissions to the Court in connection with sentencing. (Docket Entries 1762, 1764.) Without leave of the Court, Brooks supplemented his submission with further argument on December 2, 2013. (Docket Entry 1768.) On December 30, 2013, both the Government and Brooks submitted reply memoranda. (Docket Entries 1777, 1781.) Since then, both parties have clarified, reiterated, and rehashed those arguments in various correspondence to the Court. (Docket Entries 1829, 1834, 1839, 1841.) The Court also received memoranda from individual and groups of investors who held shares of DHB during the relevant time period.[2] (Docket Entries 1750, 1779)

---

[2] In briefing, the Parties have relied upon, and the Court now cites to, several documents that are not on the docket. Therefore, the Court directs that the following be placed upon the docket: Report of Jordan G. Milev, Ph.D., dated June 22, 2012; Expert Report of John F. Gould, dated February 22, 2013; Rebuttal Report of Jordan G. Milev, Ph.D., dated May 20, 2013; and Letter from Michael Joaquin of Gilardi & Co., LLC, to Linda Fowle, Supervising Probation Officer, dated May 8, 2013.

<u>DISCUSSION</u>

The Court will proceed as follows.  The Court will first discuss generally its duty to order restitution in an amount that "reasonabl[y] approximat[es]" shareholder losses, including the proximate cause analysis that inheres in that approximation.  <u>U.S. v. Gushlak</u>, 728 F.3d 184, 195-96 (2d Cir. 2013).  Next, the Court will review the Government's two-step suggested calculation of the losses.  Step one involves isolating the shareholder losses that satisfy the proximate cause requirement, while step two involves identifying the victims and calculating each victim's individual loss.  Brooks lodges myriad criticisms of the Government's suggested approach, some with which the Court agrees.  As a result of its agreement with Brooks regarding a number of those criticisms, the Court concludes by directing the Government to submit a recalculation of shareholder losses using a methodology consistent with this Memorandum and Order.

I.   <u>Restitution Owed to the Shareholders of DHB</u>

The Mandatory Victims Restitution Act, 18 U.S.C. § 3663A ("MVRA") and the Victims and Witness Protection Act, 18 U.S.C. § 3886 ("VWPA") both empower the Court to order restitution in an amount equal to the loss sustained by each victim as a result of the qualifying offenses.  There is no dispute that the Offenses of Conviction are qualifying offenses that trigger the application of these provisions.

The Second Circuit has held that restitution is only available for those losses directly and proximately caused by the "conduct composing the offense[s] of conviction." See, e.g., U.S. v. Silkowski, 32 F.3d 682, 689 (2d Cir. 1994). Proximate cause, in turn, "is a flexible concept grounded in policy considerations." U.S. v. Gamble, 709 F.3d 541, 556 (6th Cir. 2013). In the context of restitution, the Court balances its statutory obligation to make victims whole, see U.S. v. Coriaty, 300 F.3d 244, 253 (2d Cir. 2002) (holding that the "statutory focus" of the MVRA is "making victims whole"); U.S. v. Boccagna, 450 F.3d 107, 115 (2d Cir. 2006), with the need to fix a defendant's liability, even for wrongful acts. Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 186 (2d Cir. 2001). Extending the link of proximate cause to losses too far removed from the Offenses of Conviction risks turning the MVRA into an insurance policy for "inexperience, bad luck, poor choices, or unexpected market events." Delshah Grp. LLC v. Javeri, 09-CV-6909, 2013 WL 2322488, at *1 (S.D.N.Y. May 28, 2013). Severing the causal chain too soon, in contrast, results in a recovery inadequate to recompense for the foreseeable results of the predicate offenses.

Where corporate shareholders seek restitution for loss resulting from the decline in the company's stock price, the proximate causation inquiry envisioned by the MVRA and VWPA is analogous to the "loss causation" inquiry undertaken in civil

7

securities cases.  U.S. v. Rutkoske, 506 F.3d 170, 179 (2d Cir.

2007).  As such, all that is required is some "causal connection

between the [qualifying crimes] and the loss."  Dura Pharms., Inc.

v. Broudo, 544 U.S. 336, 342, 125. S. Ct. 1627, 1631, 161 L. Ed.

2d 577, 585 (2005); Lentell v. Merrill Lynch & Co., 396 F.3d 161,

172 (2d Cir. 2005) ("Loss causation is the causal link between the

alleged misconduct and the economic harm suffered by the

plaintiff." (internal quotation marks and citation omitted)).

        A fraudulent statement or omission may proximately cause

losses to shareholders in two ways.  See Carpenters Pension Trust

Fund v. Barclays PLC, 750 F.3d 227, 232-33 (2d Cir. 2014).  First,

where the fraud is ultimately revealed to the market in the form

of a corrective disclosure--a statement by the company that reveals

the fraud or an aspect thereof--any price decline that follows

that disclosure may be said to have been proximately caused by the

fraud.  See Dura Pharms., 544 U.S. at 343, 125 S. Ct. at 1632, 161

L. Ed. 2d at 585.  Second, where the company's share price drops

as a result of some foreseeable risk that was concealed by the

fraud, investor losses resulting from that drop may be deemed

proximately caused by the fraud under a "materialization of risk"

theory.  Carpenters Pension Trust Fund, 750 F.3d at 232-33;

Lentell, 396 F.3d at 173 ("Put another way, a misstatement or

omission is the 'proximate cause' of an investment loss if the

risk that caused the loss was within the zone of risk concealed by

the misrepresentations and omissions alleged by a disappointed investor." (emphasis in original)).

Regardless of whether the loss-inducing event is a corrective disclosure or a materialization of risk, demonstrating shareholder losses involves measuring the share price decline attributable to the announcement of that event. Thus, one must disentangle the price changes associated with those events from other, "ordinary" price movements. See, e.g., In re Vivendi Univ. S.A. Sec. Litig., 634 F. Supp. 2d 352, 357 (S.D.N.Y. 2009); U.S. v. Zolp, 479 F.3d 715, 719 (9th Cir. 2007) ("[T]he court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes."). An event study is a statistical analysis that performs this task. U.S. v. Martoma, 993 F. Supp. 2d 452, 458 (S.D.N.Y. 2014) ("In other words, event studies seek to 'disentangle[ ] . . . the stock price movement (if any) attributable to the release of new, allegation-related information from the movement attributable to the release of other, non-allegation-related news." (alterations and ellipsis in original) (quoting In re Xerox Corp. Sec. Litig., 99-CV-2374, 2009 WL 8556135, at *4 (D. Conn. Apr. 22, 2009)). Properly conducted event studies are widely accepted by courts in this Circuit. See, e.g., U.S. v. Kumar, 617 F.3d 612, 634 (2d Cir. 2010); Sec. Exch. Comm.

v. Razmilovic, 738 F.3d 14, 34 (2d Cir. 2013); In re Vivendi Univ. S.A. Sec. Litig., 634 F. Supp. 2d at 365.

Woven within the proximate cause analysis that the Court undertakes today is its recognition that it need not calculate the exact amount of shareholder losses; a reasonable approximation will suffice. Gushlak, 728 at 194-95; U.S. v. Agate, 613 F. Supp. 2d 315, 323 (E.D.N.Y. 2009) ("Findings of the amount of loss may be based upon reasonable estimates." (citing U.S. v. Uddin, 551 F.3d 176, 180 (2d Cir. 2009)). The need to require no more than a reasonable approximation is particularly acute where, as here, calculating the exact amount of losses sustained by shareholders is nearly impossible. Gushlak, 728 F.3d at 196 ("So long as the basis for a reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution." (quoting U.S. v. Savoie, 985 F.2d 612, 617 (1st Cir. 1993)). In addition to ensuring that complexities and difficulties in arriving at an exact figure do not preclude a just restitution order, the reasonable approximation threshold thwarts a defendant's ability to hold a restitution order captive to an endless line of technical challenges. As Judge Dearie has explained:

> Can I say that the government has proven, beyond a reasonable doubt, that its Restitution Report is without blemish? Of course not. Even the government makes no such representation. But the MVRA does not hold

10

the government or district courts to such an
impossible standard; if it did, the capacity
of a defendant with Ageloff's resolve to avoid
restitution would hold a restitution order
hostage, in perpetuity, to alarmist attacks
that the defendant himself is in the best
position to disprove, and eventually to the
pettiest of objections, perhaps on the scale
of nickel-and-dime quarrels about amounts and
specious challenges to a surname here or an
address there. The standards, consistent with
the purposes of the MVRA, require only
reasonable estimates arrived at by a
preponderance of the evidence. A fortiori,
absolute precision is not required.

U.S. v. Ageloff, 809 F. Supp. 2d 89, 103-04 (E.D.N.Y. 2011).

II.   The Milev Report

To show what portion of the decline in DHB's share price
is attributable to the Offenses of Conviction, the Government
offers the report of Dr. Jordan G. Milev ("Milev") of NERA Economic
Consulting, dated June 22, 2012 (the "Milev Report"). Brooks'
primary criticism of the Milev Report is one of causation; he
argues that Milev's analysis includes stock price declines that
were reactive to events and circumstances unrelated to the Offenses
of Conviction such that those declines cannot be considered direct
and proximate results of those offenses. As discussed below, the
Court agrees with Brooks regarding a number of those events.

A.   Milev's Methodology

Milev performs a standard event study, measuring the
decline in DHB's share price that followed certain "events."
(Milev Report ¶ 7.) Because the fraud-related component of the

stock price is removed following the disclosure of the fraud, Milev explains, the change in stock price attributable to the disclosure represents the amount that the fraud artificially inflated the stock. (Milev Report ¶ 7.) Accordingly, those price declines that Milev can say with a certain statistical confidence are the market's reaction to the disclosure of information related to the Offenses of Conviction, after adjustment for broader market and industry movements on that day, amount to the value that the market assigned to the disclosed portion of Defendants' fraud.[3] (Milev Report ¶ 11.) By measuring the decline in price that occurred each time the market became aware of the fraud or its effects, Milev arrives at the total value of the fraud perpetrated by Defendants.[4]

---

[3] Milev uses the ninety-five percent (95%) confidence interval. To be statistically significant under his analysis, therefore, a movement in the price of DHB shares must be greater than 1.96 times the standard price deviation. Under this analysis, Milev can say with ninety-five percent confidence that a statistically significant price movement is not the result of ordinary price fluctuation.

[4] In the context of this case's forfeiture proceedings, the Court refused to afford any weight to an event study offered by the Government's expert, Professor Larry Harris (the "Harris Report"). U.S. v. Hatfield, 795 F. Supp. 2d 219, 234-35 (E.D.N.Y. 2011). Though the Milev Report and the Harris Report are concededly similar, the Court finds that, with the adjustments discussed herein, the Milev Report is sufficient to allow the Court to reasonably approximate investor losses. The Milev Report is not doomed to the same fate as the Harris Report for at least three reasons. First, the Court's inquiry is different in restitution than it is in forfeiture; "[r]estitution is loss based, while forfeiture is gain based. .

The first step in Milev's analysis involves "identify[ing] the events of interest." (Milev Report ¶ 8.) Milev describes seven events of "partial disclosure[] of the Offenses of Conviction or the effects of the Offenses of Conviction" (Milev Report ¶ 12): (1) a March 16, 2005 conference call held by DHB management to discuss earnings for the fourth quarter of 2004, where management refused to provide future guidance or an explanation for the insider sales that occurred during that time period (Milev Report ¶ 14); (2) an April 18, 2006 announcement by DHB that it had been notified by LaSalle Business Credit, LLC, ("LaSalle") that DHB was in default of its loan agreement with LaSalle (Milev Report ¶ 24); (3) a May 4, 2006 announcement by DHB of the resignation of Lawrence Litowitz, the then Director of Finance (Milev Report ¶ 25); (4) a May 11, 2006 announcement by DHB of the resignation of Jerome Krantz, the then Chairman of the Audit Committee of DHB's Board of Directors (Milev Report ¶ 26);

---

. . The measures are different, and the purposes distinct."
U.S. v. Torres, 703 F.3d 194, 203 (2d Cir. 2012).  Second, a number of errors that the Court identified in the Harris Report are not present in the Milev Report.  For example, the Harris Report improperly considered reasons for DHB's share price decline that had nothing to do with the fraud.  Hatfield, 795 F. Supp. 2d at 233.  Third, the Court had no need to rely on the Harris Report because more reliable valuation methods were available to it.  Id. at 234-35.  In this context, the Court has not received any different valuation methodologies and doubts that additional submissions would be more helpful than the Milev Report.  Both the Government and Brooks have apparently recognized these distinctions, as they agree that an event study is the proper method for calculating shareholder losses.

(5) a May 23, 2006 announcement by DHB that it had been notified by the American Stock Exchange ("Amex") that DHB had fallen out of compliance with the Amex's continued listing standards (Milev Report ¶ 27); (6) a May 25, 2006 DHB announcement that it had received a Wells Notice from the Securities and Exchange Commission ("SEC") that indicated that the SEC had determined to bring a civil injunctive action against DHB (Milev Report ¶ 28); and (7) an August 18, 2006 DHB announcement that it was withdrawing reliance on its 2003 and 2004 financial statements based on errors that may require "restatement of the Company's financial statements" for those years. (Milev Report ¶ 30.)

After identifying these events, Milev calculates the market-adjusted price movement in DHB's share price that followed each of these events. (Milev Report ¶ 8.) He then confirms that the decline is statistically significant--i.e., that one can say with ninety-five percent confidence that the decline would not have been caused by ordinary share price movement. (Milev Report ¶ 11.) In those circumstances, the per-share, market-adjusted price decline is equal to the inflationary component of the fraud disclosed. As such, "an investor who purchased DHB's common stock at the inflated price prior to each of these disclosures and held over the price decline associated with these disclosures suffered an actual per-share loss stemming from the Offenses of Conviction

equal to the market adjusted price decline associated with these disclosures." (Milev Report ¶ 12.)

Combining the market-adjusted decline in DHB's share price resulting from the market's discovery of each of Defendants' fraudulent statements with data concerning the time that Defendants made those statements allows Milev to construct a table that shows the value of the fraud-induced component of DHB's share price on any given day. (Milev Report ¶¶ 36-37.) The relevant part of his inflation table is recreated below:[5]

| Date Range | Total Inflation |
|---|---|
| Prior to May 1, 2003 | None |
| May 1, 2003 - July 24 2003 | $1.69 |
| July 25, 2003 - November 11, 2003 | $1.85 |
| November 12, 2003 - March 14, 2004 | $2.01 |
| March 16, 2004 - May 6, 2004 | $2.18 |
| May 7, 2004 - August 5, 2004 | $2.34 |
| August 6, 2004 - November 9, 2004 | $2.51 |
| November 10, 2004 - March 16, 2004 | $2.68 |
| March 17, 2005 - May 10, 2005 | $2.00 |
| May 11, 2005 - July 28, 2005 | $2.68 |

---

[5] Milev distinguishes between two different "types" of inflation in DHB's share price, "Accounting Fraud Inflation" and "Reputational Damage Inflation." (Milev Report ¶ 34.) The sole source of the oxymoronic "Reputational Damage Inflation" is his measure of the market-adjusted share price decline following the March 16, 2005 conference call between investors and DHB executives. The Court discusses that date at length below, and concludes that the deflation that followed that event was a proximate result of Defendants' fraud. The Court disagrees with Milev's attempts to identify conceptual differences in the artificial price inflation of DHB. Because investors are entitled to the entirety of the inflation, drawing such distinctions is an academic endeavor which the Court will not countenance.

| | |
|---|---|
| July 29, 2005 - November 3, 2005 | $2.68 |
| November 4, 2005 - April 18, 2006 | $2.68 |
| April 19, 2006 - May 4, 2006 | $2.28 |
| May 5, 2006 - May 10, 2006 | $1.83 |
| May 11, 2006 - May 23, 2006 | $1.60 |
| May 24, 2006 | $1.44 |
| May 25, 2006 | $1.29 |
| May 26, 2006 - August 17, 2006 | $0.30 |
| August 18, 2006 - Present | None |

This table enables one to calculate the loss directly and proximately caused by Offenses of Conviction suffered by any single shareholder who bought and sold DHB shares at any given time within the date range. To illustrate, if an investor bought 10,000 shares of DHB common stock on May 15, 2005, she would have overpaid $26,800, or $2.68 per share. If she sold her shares one year later, on May 15, 2006, her per-share losses due to the fraud equals the inflationary component on the date of purchase, less the inflationary component on the date of sale. See Dura Pharms, 544 U.S. at 342, 125. S. Ct. at 1631-32, 161 L. Ed. 2d at 587 (requiring that a shareholder's damages not include the inflationary value that remained in the stock at the time of sale). According to Milev, therefore, our investor would have suffered per-share damages of $1.08 ($2.68 less $1.60), $10,800.00, in total.

Milev then aggregates the figures in this table by using a statistical model that estimates the volume of shares bought and sold each day. (Milev Report ¶¶ 45-47.) This model leads Milev

to estimate aggregate investor losses between $109.2 million and $111.9 million.  (Milev Rebuttal Report dated May 20, 2013, ¶ 7.)

      B.   <u>The Disputed Event Dates</u>

At the heart of a properly conducted event study lies the proper selection of events, and it is with this selection that Brooks disagrees.  Through both briefing and the report of his own expert, John F. Gould ("Gould"), Senior Vice President of Cornerstone Research (the "Gould Report"), dated February 22, 2013, Brooks argues that Milev improperly selected events that cannot be considered corrective disclosures.  (Gould Report ¶ 19.) Brooks disputes the inclusion of five events in Milev's study: (1) January 11, 2005, when <u>Newsday</u> published an article regarding Defendants' insider sales; (2) March 16, 2005, when DHB executives hosted a conference call with investors and analysts (Gould Report ¶¶ 21-29); (3) April 18, 2006, when DHB announced that it was in default on its obligations with LaSalle (Gould Report ¶¶ 30-34); (4) the May 4, 2006 resignation of Lawrence Litowitz (Gould Report ¶ 35); and (5) the May 11, 2006 resignation of Jerome Krantz (Gould Report ¶¶ 36-39).  Brooks also argues that Milev improperly excluded June 10, 2006, when DHB announced that Brooks had been placed on administrative leave.  (Gould Report ¶¶ 54-55.)  The Court addresses each event below.

1. January 11, 2005

On January 11, 2005, Newsday published an article titled, "Execs Get $200M in Stock Sale." See James Bernstein, Execs Get $200M In Stock Sale, NEWSDAY, Jan. 11, 2005, at A37. The article discussed Defendants' massive insider sales in the fourth quarter of 2014, and indicated that some market experts viewed the suddenness and the magnitude of the insider sales with suspicion. While Milev concedes that this share price decline is not statistically significant under his calculations, he nonetheless endorses its inclusion. (Milev Report ¶ 22.) The Court finds that this share price decline should not be included in Milev's analysis, but for different reasons.[6]

Milev should not have included January 11, 2005 in his event study because any shareholder loss that followed that date cannot be considered a direct and proximate result of the Offenses of Conviction. The core function of Milev's calculations is to isolate the inflationary—fraud-induced--component of DHB's share price on any given day. Price inflation or deflation is unlikely to result from Defendants' trading on insider information. See U.S. v. Rajaratnam, 09-CV-1184, 2012 WL 362031, at *6 (S.D.N.Y. Jan 31, 2012) ("[T]he insider trader does not cause the price of

---

[6] The Court has, after all, expressed its willingness to consider events that do not satisfy the relatively high ninety-five percent confidence interval. See Hatfield, 795 F. Supp. 2d at 234-35.

a company's stock to move."). Indeed, it is the publication of information to the market (either false information, in the case of price inflation, or a corrective disclosure or materialization of risk, in the case of price deflation) that causes movement in this artificial component of the share price. Defendants' acting on information that was not known to the market cannot reasonably be held to affect the market's perception of the stock's value, because the market remained unaware of the inside information. Id.; U.S. v. Nacchio, 573 F.3d 1062, 1076 (10th Cir. 2009) ("[T]he nondisclosure of the information allowed the stock to maintain an artificially high value and allowed Mr. Nacchio to benefit from that value when he traded in the stock.").

To be sure, Defendants saw gains from their insider trades, but Defendants' gains are not the focus of this restitution inquiry. Torres, 703 F.3d at 203. Those gains were addressed and accounted for in this case's forfeiture proceedings. U.S. v. Hatfield, 2011 WL 4434219, at *2 (E.D.N.Y. Sept. 22, 2011).

Accordingly, the Court finds that Milev should not have included January 11, 2005 as an event.

2. March 16, 2005

On March 16, 2005, DHB executives held a conference call with investors to discuss fourth quarter 2004 financial results. (Milev Report ¶ 14.) One analyst dubbed the call the "most bizarre" in his experience. (Milev Report ¶ 15.) See Ken Schachter, LI-Based

*DHB Industries Investors Up In Arms Over Top Exec's Moves*, LONG ISLAND BUS. NEWS, March 25, 2005 (available at: http://www.libn.com/2005/03/25/dhb-investors-up-in-arms-over-top-execs-moves/). During the call, Defendants gave no explanation for the insider sales that they had recently orchestrated, offered little guidance for the company going forward, and barely responded to analyst inquiries that were more than suggestive of impropriety. During the call, Brooks and Hatfield were so leery that one analyst remarked that he "[didn't] believe a word" of their representations. (Milev Rebuttal Report ¶ 25.) Following this conference call, the price of DHB's shares fell from $11.86 to $10.37. (Milev Report ¶ 19.)

Brooks contends that because the conference call was not a "corrective disclosure," it should not be included as an event in Milev's study. Brooks argues that prior to the call, investors and analysts had already been aware of many of the topics that were discussed, including the insider sales, the related-party transactions with Tactical Armor Products, and DHB's financial results. (Gould Report ¶ 24.) Therefore, the only "new news" resulting from the call was management's refusal to explain the insider sales or offer any guidance about the future of the Company. (Gould Report ¶ 24.) That news, Brooks argues, cannot "be deemed to support an inference of fraud," because there are many reasons why a manager may refuse to offer guidance as to the

future performance of a company.  (Gould Report ¶ 25.)  As a consequence, the absence of a disclosure of fraud to the market, Brooks submits, forecloses the attendant price decline from being deemed a proximate result of the fraud.

Whether a release of information to the market constitutes a corrective disclosure is a flexible inquiry.  The flexibility of the corrective disclosure inquiry reflects the reality that the market does not always learn of a fraudulent scheme in one complete <u>mea culpa</u>; instead, the truth "leak[s] out" gradually.  <u>Dura Pharms., Inc.</u>, 544 U.S. at 342, 125 S. Ct. at 1631, 161 L. Ed. at 585.  Accordingly, a corrective disclosure need only reveal some aspect of the fraud.  <u>Lentell</u>, 396 F.3d at 175; <u>In re Bradley Pharms., Inc.</u>, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006) ("We disagree with Defendants' rigid and dogmatic interpretation of <u>Dura</u>.  In <u>Dura</u>, the Supreme Court only suggested that plaintiffs needed to have alleged in some fashion that the truth became known before the share price fell.  However, <u>Dura</u> did not address what type of events or disclosures may reveal the truth.  Nor did <u>Dura</u> explain how specific such disclosure must be." (internal quotation marks omitted)).  It need not come from any specific person or entity.  <u>See</u> <u>In re Enron Corp.</u>, MDL-1446, 2005 WL 3504860, at *16 (S.D. Tex. 2005) (listing possible sources of collective disclosures).  It need not be a revelation of the same facts that the fraud obfuscated.  <u>See</u> <u>Freudenberg v. E*Trade</u>

Fin. Corp., 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (finding no
court that required a corrective disclosure be a "mirror image"
tantamount to a confession of fraud).  Most importantly, a
corrective disclosure may occur even where the defendant continues
to deny the existence of a fraud.  In re Elec. Data Sys. Sec. &
ERISA Litig., 298 F. Supp. 2d 544, 560-61 (E.D. Tex. 2004).

        Recognizing both that a corrective disclosure may take
a number of different forms so long as it at least partially
exposes the fraudulent information and that, in this context, the
Court need only reasonably approximate shareholder loss, Gushlak,
728 F.3d at 195, the Court concludes that the March 16, 2005
conference call was a partial corrective disclosure.  The call, in
its entirety, alerted investors that Defendants were at best not
being candid with their shareholders, and perhaps misleading them.
The share price decline that followed may reasonably be categorized
as an effect of the market's growing awareness to Defendants'
deception.

        For instance, Defendants were convicted of overstating
the value of certain inventories.  (See Superseding Indictment,
Docket Entry 438.)  While the conference call did not reveal that
Defendants had fraudulently overstated inventory figures, such
suspicions abounded.  During the question-and-answer portion of
the call, one analyst asked how DHB's inventory has grown over

fifty percent while sales increased and the industry was in the
midst of a raw materials shortage:

> I noticed that the inventory number, sales
> increased 23% year-over-year in the fourth
> quarter but the inventory is up over 57%. And
> I guess I'm a little bit concerned given that
> Sandra [Hatfield] was talking about the
> shortage of raw materials that your inventory
> is going up dramatically to $86 million, even
> though you have a shortage of raw materials.
> And I guess my question is, where is and what
> is all that inventory . . . ?

(Milev Report ¶ 16.)    While the question did not prompt an
admission of fraud or any prior misrepresentation regarding the
stated value of DHB's inventory, even a half-shrewd investor may
have deduced that something foul was afoot. The market had
assigned a certain inflationary value to Brooks' falsified
inventory numbers, and the depleted confidence in those numbers
that inevitably followed this colloquy lead to the ensuing share
price deflation.

    While the market perhaps did not become aware of
Defendants' fraud to the extent that a more traditional corrective
disclosure might have informed the market, focusing on the market's
certainty of the fraud is improper. It is a fundamental precept
of corporate finance that the price of a security is a function of
the market's perception of risks surrounding the company's future
cash flows. It therefore follows that the market need not be
certain of Defendants' fraud; the perception of increased risk of

that fraud is sufficient to strip at least some of the inflationary value from the share price. In this way, the fraud-induced component "fell out of the price gradually," as a result of growing market awareness and suspicion. See Gushlak, 728 F.3d at 198.

The necessity of this conclusion is buttressed by the absurdity of the alternative. To hold that the price decline that resulted from piqued investor suspicion regarding the candor and integrity of Defendants would reward Defendants' inadequate cover-up. DHB's share price declined following the conference call because Brooks and Hatfield failed to quell the market's justified skepticism of their misrepresentations. Ignoring that decline-- as Brooks implores the Court to do--would reward this failure. See In re Elec. Data Sys. Sec. & ERISA Litig., 298 F. Supp. 2d at 560-61 (E.D. Tex. 2004) ("[D]efendants cannot escape liability for fraud simply by not admitting the fraud."). The inherently flexible doctrine of proximate cause must not be applied to condone a result so facially inconsistent with the purposes of the MVRA.

Accordingly, the Court finds that Milev's selection of March 16, 2005 as an event was appropriate.

### 3. April 18, 2006

On April 18, 2006 DHB announced in an 8-K filing that on April 12, 2006, they had received a notice from one of their lenders, LaSalle, that advised DHB that it was in default under its loan agreement. (See DHB Industries, Inc., Current Report

(Form 8-K), at 2 (April 18, 2006)[7].)  The following day, DHB's share price fell from $4.66 to $4.29.  (Milev Report ¶ 24.)  Among the events of default were DHB's April 3, 2006 announcement that it was withdrawing reliance on its 2005 interim financial statements due to material misstatements of inventory.  (See DHB Industries, Inc., Current Report (Form 8-K), at 2 (April 18, 2006).)  Because Milev concludes that "[t]he events of default were all due to the Offenses of Conviction," he includes April 18, 2006 as an event date.  (Milev Report ¶ 24.)

Brooks disputes the inclusion of April 18, 2006 as an event date.  He argues that because the market was already aware of the events of default, the only "new news" that could possibly qualify as a corrective disclosure is the news of LaSalle's notifying DHB of its intent to hold DHB in default, and this announcement could not be considered "a disclosure of the fraud." Therefore, Brooks submits, the attendant price decline should not be considered.  (Gould Report ¶¶ 30-34.)

Brooks' insistence that the April 18, 2006 8-K was not a corrective disclosure begs the ultimate question of whether the ensuing losses were proximately caused by Defendants' fraud.  Even absent a corrective disclosure, a decline in share price may be

---

[7] Reports can be found at https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0000899166&owner=exclude&count=40&hidefilings=0.

attributable to a defendant's fraud where the fraud concealed some foreseeable risk that materialized and caused the share price decline.  See, e.g., In re Vivendi Univ. S.A. Sec. Litig., 634 F. Supp. 2d. at 367; Lentell, 396 F.3d at 173.  By representing that falsified inventory numbers were accurate, Defendants concealed the risk that DHB would be in default on those loan agreements that required the accurate statement of financial information, including inventory.  This is precisely the risk to which the Company fell victim on April 18, 2006.[8]

Amidst his misguided argument that April 18, 2006 is not a corrective disclosure, Brooks concedes as much; the Gould Report notes, "[t]he statistically significant stock price decrease on April 19, 2006 could only be characterized as associated with 'the effects' of a fraud, not a disclosure of fraud."  (Gould Report ¶ 34.)  Such a concession drops this event squarely within this Circuit's jurisprudence on materialization of risk, as multiple courts in this Circuit have held that an unexpected third-party reaction to concealed risks may be the direct and proximate cause of investor loss.  See, e.g.,  King Cnty., Wash. v. IKB Deutsche Industriebank AG, 708 F. Supp. 2d 334, 339 (S.D.N.Y. 2010) (finding

---

[8] The fact that there were other developments at DHB arguably unrelated to the fraud that, in themselves, were sufficient to trigger the default provision of its agreement with LaSalle is of no moment.  Which event of default actually caused LaSalle to declare DHB in default is a question of factual causation, not proximate causation.

a credit ratings downgrade an appropriate event in an event study where the defendant misrepresented that the company's investments were solid while it held billions in toxic bonds); In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005) (finding loss causation adequately pled where misleading financials concealed a liquidity risk to which the company ultimately fell victim); In re Vivendi Univ. S.A. Sec. Litig., 634 F. Supp. 2d. at 367 (ratings downgrades resulting from misrepresentations regarding liquidity were appropriately considered materializations risk).

Accordingly, the Court finds that Milev's use of April 18, 2006 as an event was appropriate.

4. May 4, 2006

On May 4, 2006, DHB announced that Lawrence Litowitz ("Litowitz"), its recently hired Director of Finance, had resigned. (Milev Report ¶ 25.) The announcement gave no indication why Litowitz had done so; it only indicated that the Company intended to begin a search for a replacement. DHB Industries, Inc., Current Report (Form 8-K), at 2 (May 4, 2006). As a result of this news, DHB's share price fell from $3.49 to $3.05. (Milev Report ¶ 25.) Later, Litowitz would testify before the SEC that he resigned in part because he "believe[ed] there may have been illegal banking acts which [he] just wouldn't tolerate being involved with." (Milev Report ¶ 25 n.46.) Reasoning that

the resignation of Litowitz was "due to the Offenses of Conviction," Milev includes May 4, 2006 as an event. (Milev Report ¶ 25.)

The announcement of Litowitz's resignation should not be considered a corrective disclosure, because at the time of the resignation, investors had no reason to suspect that it was indicative of any fraud by Defendants. See In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 513-14 (2d Cir. 2010) (finding that a director's resignation announcement that gave little reason to suspect underlying fraud was not a corrective disclosure). Nor is it a materialization of risk. See id. While it is at least conceivable that Defendants by their fraud concealed the risk that honest directors would jump ship, the Court, like the Second Circuit in Omnicom, finds this chain of causation too attenuated to credit Defendants with the resulting price decline. Id. at 514. ("The generalized investor reaction of concern . . . is far too tenuously connected--indeed by a metaphoric thread--to the [fraudulent] transaction to support liability."); Police & Fire Ret. Sys. v. SafeNet, Inc., 645 F. Supp. 2d 210, 229 (S.D.N.Y. 2009) ("Standing alone, the announcement of the departure of an officer, without explanation, would not alert investors to any improprieties so as to allege loss causation.").

Accordingly, the Court finds that it was error for Milev to include May 4, 2006 as an event in his study.

5. <u>May 11, 2006</u>

On May 11, 2006, DHB announced that Jerome Krantz ("Krantz") was resigning from its board of directors. The Company's announcement indicated that Krantz's resignation was "for personal reasons." (Milev Report ¶ 26; DHB Industries, Inc., Current Report (Form 8-K), at 2 (May 4, 2006).) On this news, DHB's stock price fell from $2.63 to $2.37. (Milev Report ¶ 26.) Concluding that Krantz's resignation was due to "factors related to the Offenses of Conviction," Milev includes May 11, 2006 as an event. (Milev Report ¶ 26.)

For the same reasons that the Court found error in Milev's use of May 4, 2006 as an event date, the Court finds error in Milev's use of May 11, 2006. The disclosure on May 11th was not a corrective disclosure, as it did not reveal the fraud or any aspect thereof. Nor can the Court say with confidence that Krantz's resignation amounted to the materialization of a foreseeable risk concealed by Defendants' fraud. See <u>In re Omnicom Grp., Inc.</u>, 597 F.3d at 513-14.

Accordingly, the Court finds that it was error for Milev to include May 11, 2006 as an event in his study.

6. <u>July 10, 2006</u>

On July 10, 2006, DHB announced that "its Board of Directors has placed David Brooks . . . on paid administrative leave for an indefinite period of time pending the outcome of

federal, state and internal investigations." (Gould Report ¶ 55; DHB Industries, Inc., Current Report (Form 8-K), at 2 (July 10, 2006).) By the close of market on July 11, 2006, DHB's share price had increased from $.90 to $1.37. Brooks argues that because this news "is associated with the fraud and caused investor gains," this increase should offset investor losses. (Gould Report ¶ 55).

Brooks' argument for using fraud related investor gains to offset losses conflates two separate components of DHB's share price. Even assuming that there can be, as Brooks submits, fraud-related good news, that good news bears no relationship to the amount of which shareholders were defrauded. Milev's calculations isolate the inflationary component of the share price, thus capturing the added perceived value directly and proximately attributable to Defendants' misrepresentations. News of Brooks' removal bears no relationship to that inflationary component. This argument suggests that the drop in the <u>artificially</u> inflated component of DHB's share price should somehow be offset by changes in the <u>actual</u> value of the Company. That suggestion defies logic. While the price increase following this announcement demonstrates that the market saw value in Brooks' removal from the Company, that value was <u>actual</u> value, having no relationship to the <u>artificial</u> value that Defendants created and the Milev Report captures.

Accordingly, the Court finds that Milev correctly excluded July 10, 2006 as an event.

C.    The Disputed Event Windows

While Brooks does not contend that Milev incorrectly included May 23, 2006 and May 25, 2006 as events, he disagrees with Milev's selection of an appropriate event window to measure the share price reaction to those events.  The event window is the length of time after the disclosure that is analyzed for price changes in order to quantify the loss associated with that disclosure.

1.    May 23, 2006—May 25, 2006

On May 23, 2006, DHB announced that it had been notified by the Amex that the Company was in violation of its continued listing standards and was in danger of being delisted.  (DHB Industries, Inc., Current Report (Form 8-K), at 2 (May 23, 2006).) From the time of the announcement to the close of trading on May 25, 2006, the price of DHB's shares fell from $2.22 to $1.92. (Milev Report ¶ 27.)

Milev included the share price decline on May 25 because "the price declined statistically significantly over two consecutive trading days following the announcement, and no additional news regarding DHB was released during that time." (Milev Report ¶ 27 n.54).  Brooks disagrees with the extension of the event window beyond the close of the market on May 24th.  He

argues that a key tenet of the efficient market assumption--a central assumption of a proper event study--is that the market reacts quickly to the release of information. (Gould Report ¶ 43). As a result, Brooks argues, the market would not have reacted to the May 23rd disclosure on May 25th.

The selection of an appropriate event window is an inexact science, the goal of which is to select a window long enough so that the period includes the entirety of the market's reaction to the information released, and short enough so that other "noise" and information from other events are excluded. See In re Sec. Cap. Assur. Ltd. Sec. Litig., 729 F. Supp. 2d 569, 600 n.5 (S.D.N.Y. 2010). In selecting the event window, the efficient market theory is critical. It counsels the Court that the market digests events quickly and completely, and an event window therefore need not be exceedingly long in order serve its purpose. Compare U.S. v. Ferguson, 584 F. Supp. 2d 447, 453 (D. Conn. 2008) (finding a thirty-day event window too long where it included days where the price movement was not statistically significant) with Fogarazzao v. Lehman Bros., Inc., 232 F.R.D. 176, 189 (S.D.N.Y. 2005) (holding that an event window ending on the day after the release of the information was appropriate) and Lehocky v. Tidel Techs., Inc., 220 F.R.D. 491, 507 (S.D. Tex. 2004) (concluding that plaintiff's expert's event study using two-day window was "sufficient to demonstrate, for class certification purposes, that

a cause and effect relationship between company-specific announcements and stock price may exist").  One commentator has indicated that the "academic standard is to extend the event period to the close of trading on the day after the release of the pertinent information."  See Mark L. Mitchell & Jeffry M. Netter, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, 49 Bus. Law. 545, 559 (1994).

        The Court finds that an appropriate event window following this announcement concludes at the close of trading on May 24, 2006.  Including the entirety of the trading for one day following the announcement is appropriate for a number of reasons. First, it is in accord with generally accepted practice.  Second, leaving the event window open for a full trading day following the announcement contemplates enough time for the news to reach and be digested and acted upon by investors and their clients.  This is especially so where, as here, the release occurred late in the day.  Finally, including the entire day following the announcement allows the accounting for any residual or momentum trading by investors.  It would be inconsistent with both the purpose of the event study and the efficient market hypothesis, however, to include trading on May 25, 2006.  The Court finds it unlikely that investors--who had undoubtedly been watching DHB very closely since at least the beginning of March--would have taken so long to

react to the May 23rd news.  Moreover, as Brooks points out, the Company's share price actually increased through the remainder of the day on May 24th.  (Gould Report ¶ 42.)  This price increase can hardly be considered a response to the news that the stock would be delisted.  Therefore, the likelihood that, at the time of the increase, the market was still reacting to that news is exceedingly remote.

### 2.  May 25, 2006—July 6, 2006

After the market closed on May 25, 2006, DHB announced that it had received a Wells Notice from the SEC that "indicates that the Staff has preliminarily determined to recommend that the SEC bring a civil injunctive action against the Company."  (Milev Report ¶ 28; DHB Industries, Inc., Current Report (Form 8-K), at 2 (May 25, 2006).)  Shortly after the market opened on May 26th, shares of DHB were halted from trading.  The shares resumed trading on July 6, 2006.  From market close on May 25th to market close on July 6th, the price fell from $1.92 per share to $0.86 per share. (Milev Report ¶ 29.)

Brooks argues that extending the event window to market close on July 6, 2006 was improper for two reasons.  First, DHB traded for some time on May 26th, so the market had time to digest the new information before trading was halted.  (Gould Report ¶ 45.)  Second, news was announced while DHB was not trading that had nothing to do with the fraud, and any price decline on July 6th

could therefore have been a result of that unrelated news rather than the May 25th announcement. (Gould Report ¶ 46.) For instance, on June 26th, CNN reported that the United States was planning to withdraw troops from Iraq. (Gould Report ¶ 46.) Thus, Brooks argues, the share price decline on July 6th could just as easily have been a result of that news--which was likely to lead to lower demand for DHB product--rather than the May 25th news.

The Court disagrees. Just as the Court concluded that ending the event window after a full trading day following the release of the May 23, 2006 8-K was appropriate, the Court finds a full trading day to be an appropriate event window here. Ending the event window in the morning of May 26th is improper, as even the most efficient of markets would not have fully digested the information by then. The facts bear this out. Only 800 shares of DHB were traded on May 26th before trading was halted. (Milev Rebuttal Report ¶ 54.) Had the market fully digested and responded to the announcement, the Court suspects that the trading volume would have been much greater.

Brooks' contention that non-fraud related disclosures during DHB's suspension from trade may have caused the decline is incorrect. Milev, in all of his calculations, uses a statistical regression to account for market and industry-related factors, so that any price decline attributable to broader market news, such as United States military action, is discounted. (Milev Report

¶ 10.) By adjusting for market and industry related price decline, Milev ensures that he is only calculating losses that are idiosyncratic to DHB. As a result, the Court finds that the release of news related to DHB during the time trading was halted does not require Milev to close the event window prior to the stock's trading freeze.

Accordingly, Milev was correct in including the <u>market-adjusted</u> per-share price decline from May 26, 2006 to market close on July 6, 2006 in his calculation

D.   <u>Brooks' Remaining Criticisms</u>

Brooks lodges other criticisms of the Milev report, all related to the statistical model that Milev uses to aggregate shareholder losses. The Court, however, does not rely upon Milev's aggregation of losses. Instead, it relies upon the calculation of Gilardi & Co. LLC's ("Gilardi"), which uses actual data regarding individual shareholders, not a statistical model. This is consistent with the Second Circuit's requirement that victims must be identified prior to the imposition of a restitution order. <u>See</u> <u>U.S. v. Catoggio</u>, 326 F.3d 323, 327 (2d Cir. 2003). The Court, therefore, need not address the validity of Milev's calculation of aggregate shareholder losses.

III. <u>Gilardi's Methodology for Calculating Individual Losses</u>

The Government also retained Gilardi to identify shareholder victims and calculate their individual restitution

claims.  Gilardi used two methods for identifying shareholders that were entitled to restitution.  First, Gilardi sent 136,445 cover letters and proof of claim forms to persons and entities that Gilardi had identified as possible victims.  Gilardi received a total of 9,637 proofs of claim in return.  Second, Gilardi used data available to it in connection with its role as the claims administrator in the securities class action against DHB, In re DHB Indus., Inc., 05-CV-4345 (E.D.N.Y. Sept. 9, 2005).  Reviewing this data allowed Gilardi to identify an additional 11,893 individuals or entities that had purchased stock over the relevant time period and were therefore entitled to restitution.  See Letter from Gilardi & Co. LLC to Ms. Linda Fowle (May 8, 2013).

For each identified shareholder, Gilardi calculated losses by referencing Milev's inflation table.  For any given shareholder, his losses directly and proximately caused by the Offenses of Conviction were equal to total inflation on the date of purchase.  Consistent with Dura Pharms, 544 U.S. at 336, 125. S. Ct. at 1627, 161 L. Ed. 2d at 585, Gilardi ensured that where a shareholder sold his shares prior to August 18, 2006, his losses equaled the difference between the total inflation per share on the date of the purchase and the total inflation per share on the date of the sale.

Brooks advances two criticisms of Gilardi's work, neither of which make even a close pass at a meritorious objection.

First, Brooks argues that "[r]elying on any aspect of the claims filed in the pending civil case fatally undermined the accuracy of the restitution loss number." (Brooks' Mem. on Restitution, Docket Entry 1764, at 33.) Beyond this bit of ipse dixit, however, Brooks does not advance a cogent argument why. That the proposed class settlement was invalidated, or that the class complaint contains allegations not included in the Indictment are irrelevant distinctions. Milev's study concludes that all DHB shareholders who held stock over the relevant time period were harmed, and the proof of claims submitted in the class action has enabled Gilardi to identify those shareholders more efficiently than starting anew would allow. The Court sees no reason to exclude certain individuals and entities that held stock during the relevant to period from the restitution analysis simply because Gilardi already had their data. Second, Brooks argues that Gilardi's methodology is somehow flawed because it did not account for the fact that some shareholders may have held their stock until 2007, "when DHB was trading at multiples of the price in August 2006." (Brooks' Mem. on Restitution at 35.) The fact that DHB's actual value increased, however, says nothing of the artificial inflation that had fallen from the stock by August 2006.

As a result, the Court finds that Gilardi's methodology for identifying shareholders and calculating losses is appropriate. Nonetheless, because it relies upon Milev's

inflation table, which is flawed for the reasons discussed above, the Court finds that the figure calculated by Gilardi is not a reliable estimate of shareholder loss.

CONCLUSION

The Court remains mindful of its obligation to fashion a restitution order that attempts to "restore these victims to their original state of well-being," and is optimistic that a corrected submission from the Government will enable it to make a just determination. See Ageloff, 809 F. Supp. 2d at 102 (quoting Boccagna, 450 F.3d at 115). Accordingly, the Court (1) RESERVES JUDGMENT on the amount of restitution due to any victim and (2) DIRECTS the Government to submit a supplemental calculation of shareholder losses that modifies Milev's calculations in a manner consistent with this Memorandum and Order. The Court expects the corrections to Milev's report to include removing the price declines associated with the developments on May 4, 2006 and May 11, 2006, and correcting the event window for the May 23, 2006 news. Upon receipt of a corrected inflation table, Gilardi & Co. may calculate losses of the identified victims using the same methodology, updating its figures for any new victims that have been identified since its prior submission. The Government is ORDERED to file this revised submission within thirty (30) days of the date of this Order. The Court will not accept opposition papers. Additionally, because both the Government and Brooks have

relied heavily upon the expert materials discussed herein (<u>see</u> n.2)) and the Court sees no grounds for their confidentiality, both parties are ORDERED to file those reports on the docket within seven (7) days of the date of this Order.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:      December __18__, 2014
            Central Islip, New York